MARIO A. MOYA (State Bar No. 262059)
REBECCA M. HOBERG (State Bar No. 224086)
MOYA LAW FIRM
1300 Clay Street, Suite 600
Oakland, California 94612
Tel:  510.926.6521
Fax: 510.340.9055
Email: mmoya@moyalawfirm.com
         rhoberg@moyalawfirm.com

Attorneys for Plaintiff
MULTIFLORA INTERNATIONAL LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MULTIFLORA INTERNATIONAL LTD., a British Virgin Islands company limited by shares,<br><br>Plaintiff,<br><br>v.<br><br>CABAN SYSTEMS, INC., a Delaware corporation; GAIA INVESTMENT HOLDINGS CORP., a Panamanian corporation; ALEXANDRA RASCH, an individual; JACQUELINE RASCH, an individual; NADINE RASCH, an individual; CHRISTIAN RASCH, an individual; and DOES 1–20, inclusive,<br><br>Defendants. | Case No. 4:24-cv-04455-YGR<br><br>**DECLARATION OF MARIO A. MOYA IN SUPPORT OF PLAINTIFF'S NOTICE PURSUANT TO RULE 44.1 OF THE  FEDERAL RULES OF CIVIL PROCEDURE OF INTENT TO RAISE ISSUES OF FOREIGN LAW**<br><br>[Fed. R. Civ. P. 44.1]<br><br>Date: Tues. Dec. 10, 2024<br>Time: 2:00 pm<br>Courtroom 1<br>Judge:  Hon. Yvonne Gonzalez-Rogers<br><br>Complaint Filed: 07/23/2024<br>FAC Filed: 10/07/2024 |

MOYA DECL. ISO PLAINTIFF'S NTC. RE: INTENT TO RAISE ISSUES OF FOREIGN LAW

I, Mario A. Moya, hereby declare as follows:

1.     I am an attorney duly admitted to practice before the State of California and in all state and federal courts within the State of California.  I am the owner of the Moya Law Firm, which is located at 1300 Clay Street, Suite 600, in Oakland, California 94612, and am counsel for Plaintiff Multiflora International Ltd. ("Plaintiff") in this action.  I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true.  If called as a witness, I could and would competently testify to the matters stated herein.

2.     I make this declaration in support of Plaintiff's accompanying Notice Pursuant to Rule 44.1 of the Federal Rules Of Civil Procedure of Intent To Raise Issues Of Foreign Law.

3.     Attached hereto as **Exhibit A** is a true and correct copy of the Limitation Ordinance of 1961 (Cap 43) from the Revised Laws of the Virgin Islands.  The original document is in English, and there is no need for a translation.  I conferred with a BVI-licensed attorney to confirm the document attached hereto as Exhibit A is, indeed, a true and correct copy of the Limitation Ordinance of 1961.  I also confirmed this by obtaining a scanned hard copy directly from the Los Angeles County Law Library electronic research service.  I have no reason to believe that Exhibit A is not what it purports to be.

4.     Attached hereto as **Exhibit B** is a true and correct copy of the published decision dated May 23, 2001 of the England and Wales High Court (Chancery Division) entitled, *CMS Dolphin Ltd v. Simonet & Anr* [2001] EWHC Ch 415, [2002] BCC 600.  The original document is in English, and there is no need for a translation.  I obtained this document directly from the British and Irish Legal Information Institute (BAILLI) online database at the following URL: https://www.bailii.org/ew/cases/EWHC/Ch/2001/415.html.

5.     This request is brought in good faith and for no improper purpose.


//

//

//

---

MOYA DECL. ISO PLAINTIFF'S NTC. RE: INTENT TO RAISE ISSUES OF FOREIGN LAW

*Multiflora Int'l Ltd. v. Caban Systems et al.*
No. 4:24-cv-04455-YGR

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of November 2024 at Larkspur, California

*/s/ Mario A. Moya*

_____
Mario A. Moya

# EXHIBIT A

# CHAPTER 43.

LIMITATION.

(24*th August*, 1961.)

20/1961
33/1961

## PART I.

### PRELIMINARY.

**1.** This Ordinance may be cited as the Limitation Ordinance.

Short title.

**2.** In this Ordinance—

Interpretation.

"action" includes any proceeding in a court of law;

"duty" includes any debt due to Her Majesty;

"foreshore" means the shore and bed of the sea and of any tidal water, below the line of the medium high tide between the spring tides and the neap tides;

"land" includes corporeal hereditaments and rentcharges, and any legal or equitable estate or interest therein, including an interest in the proceeds of the sale of land held upon trust for sale, but save as aforesaid does not include any incorporeal hereditaments;

"parent" has the same meaning as in the Fatal Accidents Act;

Cap. 26.

"personal estate" and "personal property" do not include chattels real;

"rent" includes a rentcharge and a rentservice;

"rentcharge" means any annuity or periodical sum of money charged upon or payable out of land, or a rent service or interest on a mortgage on land;

"settled land" and "tenant for life" have the same meanings respectively as in the Settled Estates Act;

Cap. 230.

466        **CAP. 43**)            *Limitation.*

"ship" includes every description of vessel used in navigation not propelled by oars;

Cap. 303.

"trust" and "trustee" have the same meanings respectively as in the Trustee Ordinance;

"trust for sale" has the same meaning as in the Trustee Ordinance.

(2)  For the purposes of this Ordinance, a person shall be deemed to be under a disability while he is an infant, or of unsound mind, or a convict subject to the operation of the Forfeiture Act, in whose case no administrator or curator has been appointed under that Act.

Cap. 29.

(3)  For the purposes of the last foregoing subsection but without prejudice to the generality thereof, a person shall be conclusively presumed to be of unsound mind while he is detained in pursuance of any enactment authorising the detention of persons of unsound mind or criminal lunatics.

(4)  A person shall be deemed to claim through another person, if he became entitled by, through, under, or by the act of that other person to the right claimed, and any person whose estate or interest might have been barred by a person entitled to an entailed interest in possession shall be deemed to claim through the person so entitled:

Provided that a person becoming entitled to any estate or interest by virtue of a special power of appointment shall not be deemed to claim through the appointor.

(5)  References in this Ordinance to a right of action to recover land shall include references to a right to enter into possession of the land or, in the case of rentcharges, to distrain for arrears of rent, and references to the bringing of such an action shall include references to the making of such an entry or distress.

(6)  References in this Ordinance to the possession of land shall, in the case of rentcharges, be construed as references to the receipt of the rent, and references to the date of dispossession or discontinuance of possession of land shall, in the case of rentcharges, be construed as references to the date of the last receipt of rent.

(7)  In Part II references to a right of action shall include references to a cause of action and to a right to receive money secured by a mortgage or charge on any property or to recover

proceeds of the sale of land, and to a right to receive a share or interest in the personal estate of a deceased person; and references to the date of the accrual of a right of action shall—

(*a*) in the case of an action for an account, be construed as references to the date on which the matter arose in respect of which an account is claimed;

(*b*) in the case of an action upon a judgment, be construed as references to the date on which the judgment became enforceable;

(*c*) in the case of an action to recover arrears of rent, dower or interest, or damages in respect thereof, be construed as references to the date on which the rent, dower or interest became due.

## PART II.

PERIODS OF LIMITATION FOR DIFFERENT CLASSES OF ACTION.

**3.** The provisions of this Part shall have effect subject to the provisions of Part III which provide for the extension of the periods of limitation in the case of disability, acknowledgment, part payment, fraud and mistake.

Part II to be subject to provisions of Part III relating to disability, acknowledge-ment, fraud, etc.

*Actions of contract and tort and certain other actions.*

**4.** (1) The following actions shall not be brought after the expiration of six years from the date on which the cause of action accrued, that is to say—

Limitations of actions of contract and tort, and certain other actions.

(*a*) actions founded on simple contract or on tort;

(*b*) actions to enforce a recognisance;

(*c*) actions to enforce an award, where the submission is not by an instrument under seal;

(*d*) actions to recover any sum recoverable by virtue of any enactment, other than a penalty or forfeiture or sum by way of penalty or forfeiture.

(2) An action for an account shall not be brought in respect of any matter which arose more than six years before the commencement of the action.

(3) An action upon a specialty shall not be brought after the expiration of twelve years from the date on which the cause of action accrued:

Provided that this subsection shall not affect any action for which a shorter period of limitation is prescribed by any other provision of this Ordinance.

(4) An action shall not be brought upon any judgment after the expiration of twelve years from the date on which judgment became enforceable, and no arrears of interest in respect of any judgment debt shall be recovered after the expiration of six years from the date on which the interest became due.

(5) An action to recover any penalty or forfeiture, or sum by way of penalty or forfeiture, recoverable by virtue of any enactment shall not be brought after the expiration of two years from the date on which the cause of action accrued:

Provided that for the purposes of this subsection the expression "penalty" shall not include a fine to which any person is liable on conviction of a criminal offence.

(6) Subsection (1) shall apply to an action to recover seamen's wages, but save as aforesaid this section shall not apply to any cause of action within the Admiralty jursidiction of the High Court which is enforceable *in rem.*

(7) This section shall not apply to any claim for specific performance of a contract or for an injunction or for other equitable relief, except in so far as any provision thereof may be applied by the Court by analogy in like manner as the corresponding enactment repealed by this Ordinance has heretofore been applied.

Limitation in case of successive conversions and extinction of title of owner of converted goods.

**5.** (1) Where any cause of action in respect of the conversion or wrongful detention of a chattel has accrued to any person and, before he recovers possession of the chattel, a further conversion or wrongful detention takes places, no action shall be brought in respect of the further conversion or detention after the expiration of six years from the accrual of the cause of action in respect of the original conversion or detention.

(2) Where any such cause of action has accrued to any person and the period prescribed for bringing that action and for bringing any action in respect of such a further conversion or wrongful detention as aforesaid has expired and he has not during that period recovered possession of the chattel, the title of that person to the chattel shall be extinguished.

*Limitation.*        (**CAP. 43**        469

---

*Actions to recover land and rent.*

**6.** (1) No action shall be brought by the Crown to recover any land after the expiration of thirty years from the date on which the right of action accrued to the Crown or, if it first accrued to some person through whom the Crown claims, to that person:

Provided that an action to recover foreshore may be brought by the Crown at any time before the expiration of sixty years from the said date, and where any right of action to recover land, which has ceased to be foreshore but remains in the ownership of the Crown, accrued when the land was foreshore, the action may be brought at any time before the expiration of sixty years from the date of the accrual of the right of action, or of thirty years from the date when the land ceased to be foreshore, whichever period first expires.

(2) No action shall be brought by any spiritual or eleemosynary corporation sole to recover any land after the expiration of thirty years from the date on which the right of action accrued to the corporation sole or, if it first accrued to some person through whom the corporation sole claims, to that person.

(3) No action shall be brought by any other person to recover any land after the expiration of twelve years from the date on which the right of action accrued to him or, if it first accrued to some person through whom he claims, to that person:

Provided that, if the right of action first accrued to the Crown or a spiritual or eleemosynary corporation sole through whom the person bringing the action claims, the action may be brought at any time before the expiration of the period during which the action could have been brought by the Crown or the corporation sole, or of twelve years from the date on which the right of action accrued to some person other than the Crown or the corporation sole, whichever period first expires.

**7.** (1) Where the person bringing an action to recover land, or some person through whom he claims, has been in possession thereof, and has while entitled thereto been dispossessed or discontinued his possession, the right of action shall be deemed to have accrued on the date of the dispossession or discontinuance.

*[Margin notes:]* Limitation of actions to recover land.

Accrual of right of action in case of present interests in land.

470          **CAP. 43)**              *Limitation.*

(2) Where any person brings an action to recover any land of a deceased person, whether under a will or on intestacy, and the deceased person was on the date of his death in possession of the land or, in the case of a rentcharge created by will or taking effect upon his death, in possession of the land charged, and was the last person entitled to the land to be in possession thereof, the right of action shall be deemed to have accrued on the date of his death.

(3) Where any person brings an action to recover land, being an estate or interest in possession assured otherwise than by will to him, or to some person through whom he claims, by a person who, at the date when the assurance took effect, was in possession of the land or, in the case of a rentcharge created by the assurance, in possession of the land charged, and no person has been in possession of the land by virtue of the assurance, the right of action shall be deemed to have accrued on the date when the assurance took effect.

Accrual of right
of action in case
of future
interests.

**8.** (1) Subject as hereafter in this section provided, the right of action to recover any land shall, in a case where the estate or interest claimed was an estate or interest in reversion or remainder or any other future estate or interest and no person has taken possession of the land by virtue of the estate or interest claimed, be deemed to have accrued on the date on which the estate or interest fell into possession by the determination of the preceding estate or interest.

(2) If the person entitled to the preceding estate or interest, was not in possession of the land on the date of the determination thereof, no action shall be brought by the person entitled to the succeeding estate or interest after the expiration of twelve years from the date on which the right of action accrued to the person entitled to the preceding estate or interest, or six years from the date on which the right of action accrued to the person entitled to the succeeding estate or interest, whichever period last expires:

Provided that, where the Crown or a spiritual or eleemosynary corporation sole is entitled to the succeeding estate or interest, the foregoing provisions of this subsection shall have effect with the substitution for the reference to twelve years of a reference to thirty years, and for the reference to six years of a reference to twelve years.

(3) The foregoing provisions of this section shall not apply to any estate or interest which falls into possession on the

determination of an entailed interest and which might have been barred by the person entitled to the entailed interest.

(4) No person shall bring an action to recover any estate or interest in land under an assurance taking effect after the right of action to recover the land had accrued to the person by whom the assurance was made or some person through whom he claimed or some person entitled to a preceding estate or interest, unless the action is brought within the period during which the person by whom the assurance was made could have brought such an action.

(5) Where any person is entitled to any estate or interest in land in possession and, while so entitled, is also entitled to any future estate or interest in that land, and his right to recover the estate or interest in possession is barred under this Ordinance, no action shall be brought by that person, or by any person claiming through him, in respect of the future estate or interest, unless in the meantime possession of the land has been recovered by a person entitled to an intermediate estate or interest.

**9.** (1) Subject to the provisions of subsection (1) of section 19, the provisions of this Ordinance shall apply to equitable interests in land, including interests in the proceeds of the sale of land held upon trust for sale, in like manner as they apply to legal estates, and accordingly a right of action to *recover the land shall, for the purposes of this Ordinance* but not otherwise, be deemed to accrue to a person entitled in possession to such an equitable interest in the like manner and circumstances and on the same date as it would accrue if his interest were a legal estate in the land.

*Provisions in case of settled land and land held on trust.*

*33/1961.*

(2) Where the period prescribed by this Ordinance has expired for the bringing of an action to recover land by a tenant for life of settled land, his legal estate shall not be extinguished, if and so long as the right of action to recover the land of any person entitled to a beneficial interest in the land either has not accrued or has not been barred by this Ordinance, and the legal estate shall accordingly remain vested in the tenant for life and shall devolve in accordance with the Settled Estates Act; but if and when every such right of action as aforesaid has been barred by this Ordinance, the said legal estate shall be extinguished.

*Cap. 230.*

33/1961.

(3)  Where any land is held upon trust including a trust for sale, and the period prescribed by this Ordinance has expired for the bringing of an action to recover the land by the trustees, the estate of the trustees shall not be extinguished if and so long as the right of action to recover the land of any person entitled to a beneficial interest in the land or in the proceeds of sale either has not accrued or has not been barred by this Ordinance, but if and when every such right of action has been so barred the estate of the trustees shall be extinguished.

33/1961.

(4)  Where any land is held upon trust, including a trust for sale, an action to recover the land may be brought by the trustees on behalf of any person entitled to a beneficial interest in possession in the land or in the proceeds of sale whose right of action has not been barred by this Ordinance, notwithstanding that the right of action of the trustees would apart from this provision have been barred by this Ordinance.

33/1961.

(5)  Where any settled land or any land held on trust for sale is in the possession of a person entitled to a beneficial interest in the land or in the proceeds of sale, not being a person solely and absolutely entitled thereto, no right of action to recover the land shall be deemed for the purposes of this Ordinance to accrue during such possession to any person in whom the land is vested as tenant for life or trustee, or to any other person entitled to a beneficial interest in the land or the proceeds of sale.

Accrual of right of action in case of forfeiture or breach of condition.

**10.**  A right of action to recover land by virtue of a forfeiture or breach of condition shall be deemed to have accrued on the date on which the forfeiture was incurred or the condition broken:

Provided that, if such a right has accrued to a person entitled to an estate or interest in reversion or remainder and the land was not recovered by virtue thereof, the right of action to recover the land shall not be deemed to have accrued to that person until his estate or interest fell into possession, as if no such forfeiture or breach of condition had occurred.

Accrual of right of action in case of certain tenancies.

**11.**  (1)  A tenancy at will shall, for the purposes of this Ordinance, be deemed to be determined at the expiration of a period of one year from the commencement thereof, unless it has previously been determined, and accordingly the right of action of the person entitled to the land subject to the

tenancy shall be deemed to have accrued on the date of such determination.

(2) A tenancy from year to year or other period, without a lease in writing shall, for the purposes of this Ordinance, be deemed to be determined at the expiration of the first year or other period, and accordingly the right of action of the person entitled to the land subject to the tenancy shall be deemed to have accrued at the date of such determination:

Provided that, where any rent has subsequently been *received in respect of the tenancy*, the right of action shall be deemed to have accrued on the date of the last receipt of rent.

(3) Where any person is in possession of land by virtue of a lease in writing by which a rent of not less than three dollars is reserved, and the rent is received by some person wrongfully claiming to be entitled to the land in reversion immediately expectant on the determination of the lease, and no rent is subsequently received by the person rightfully so entitled, the right of action of the last-named person to recover the land shall be deemed to have accrued at the date when the rent was first received by the person wrongfully claiming as aforesaid and not at the date of the determination of the lease.

(4) Subsections (1) and (3) shall not apply to any tenancy at will or lease granted by the Crown.

**12.** (1) No right of action to recover land shall be deemed to accrue unless the land is in the possession of some person in whose favour the period of limitation can run (hereafter in this section referred to as "adverse possession") and where under the foregoing provisions of this Ordinance any such right of action is deemed to accrue on a certain date and no person is in adverse possession on that date, the right of action shall not be deemed to accrue unless and until adverse possession is taken of the land.

Right of action not to accrue or continue unless there is adverse possession.

(2) Where a right of action to recover land has accrued and thereafter, before the right is barred, the land ceases to be in adverse possession, the right of action shall no longer be deemed to have accrued and no fresh right of action shall be deemed to accrue unless and until the land is again taken into adverse possession.

(3) For the purposes of this section—

474          CAP. 43)                    *Limitation.*

(*a*) possession of any land subject to a rentcharge by a person (other than the person entitled to the rentcharge) who does not pay the rent shall be deemed to be adverse possession of the rentcharge; and

(*b*) receipt of rent under a lease by a person wrongfully claiming, in accordance with subsection (3) of the last foregoing section, the land in reversion shall be deemed to be adverse possession of the land.

**Cure of defective disentailing assurance.**

**13.** Where a person entitled in remainder to an entailed interest in any land has made an assurance thereof which fails to bar the issue in tail or the estates and interests taking effect on the determination of the entailed interest, or fails to bar the last-mentioned estates and interests only, and any person takes possession of the land by virtue of the assurance, and that person or any other person whatsoever (other than a person entitled to possession by virtue of the settlement) is in possession of the land for a period of twelve years from the commencement of the time at which the assurance, if it had then been executed by the person entitled to the entailed interest, would have operated, without the consent of any other person, to bar the issue in tail and such estates and interests as aforesaid, then, at the expiration of that period, the assurance shall operate, and be deemed always to have operated, to bar the issue in tail and those estates and interests.

**Limitation of redemption actions.**

**14.** When a mortgagee of land has been in possession of any of the morgaged land for a period of twelve years, no action to redeem the land of which the mortgagee has been so in possession shall thereafter be brought by the mortgagor or any person claiming through him.

**No right of action to be preserved by formal entry or continual claim.**

**15.** For the purposes of this Ordinance, no person shall be deemed to have been in possession of any land by reason only of having made a formal entry thereon, and no continual or other claim upon or near any land shall preserve any right of action to recover the land.

**Administration to date back to death.**

**16.** For the purposes of the provisions of this Ordinance relating to actions for the recovery of land, an administrator of the estate of a deceased person shall be deemed to claim as if there had been no interval of time between the death of the deceased person and the grant of the letters of administration.

**17.** No action shall be brought, or distress made, to recover arrears of rent, or damages in respect thereof, after the expiration of six years from the date on which the arrears became due.

<div style="float:right">Limitation of actions to recover rent.</div>

*Actions to recover money secured by a mortgage or charge or to recover proceeds of the sale of land.*

**18.** (1) No action shall be brought to recover any principal sum of money secured by a mortgage or other charge on property, whether real or personal, or to recover proceeds of the sale of land, after the expiration of twelve years from the date when the right to receive the money accrued.

<div style="float:right">Limitation of actions to recover money secured by a mortgage or charge or to recover proceeds of the sale of land.</div>

(2) No foreclosure action in respect of mortgaged personal property shall be brought after the expiration of twelve years from the date on which the right to foreclose accrued:

Provided that if, after that date the mortgagee was in possession of the mortgaged property, the right to foreclose on the property which was in his possession shall not, for the purposes of this subsection, be deemed to have accrued until the date on which his possession discontinued.

(3) The right to receive any principal sum of money secured by a mortgage or other charge and the right to foreclose on the property subject to the mortgage or charge shall not be deemed to accrue so long as that property comprises any future interest or any life insurance policy which has not matured or been determined.

(4) Nothing in this section shall apply to a foreclosure action in respect of mortgaged land, but the provisions of this Ordinance relating to actions to recover land shall apply to such an action.

(5) No action to recover arrears of interest payable in respect of any sum of money secured by a mortgage or other charge or payable in respect of proceeds of the sale of land, or to recover damages in respect of such arrears shall be brought after the expiration of six years from the date on which the interest became due:

Provided that—

(*a*) where a prior mortgagee or other incumbrancer has been in possession of the property charged, and an action is brought within one year of the discontinuance

476          **CAP. 43**)                    *Limitation.*

33/1961.

of such possession by the subsequent incumbrancer, he may recover by that action all the arrears of interest which fell due during the period of possession by the prior incumbrancer or damages in respect thereof, notwithstanding that the period exceeded six years;

(*b*) where the property subject to the mortgage or charge comprises any future interest or life insurance policy and it is a term of the mortgage or charge that arrears of interest shall be treated as part of the principal sum of money secured by the mortgage or charge, interest shall not be deemed to become due before the right to receive the principal sum of money has accrued or is deemed to have accrued.

(6) This section shall not apply to any mortgage or charge on a ship.

*Actions in respect of trust property or the personal estate of deceased persons.*

Limitation of actions in respect of trust property.

**19.** (1) No period of limitation prescribed by this Ordinance shall apply to an action by a beneficiary under a trust, being an action—

(*a*) in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy; or

(*b*) to recover from the trustee trust property or the proceeds thereof in the possession of the trustee, or previously received by the trustee and converted to his use.

33/1961.

(2) Subject as aforesaid, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Ordinance, shall not be brought after the expiration of six years from the date on which the right of action accrued:

Provided that the right of action shall not be deemed to have accrued to any beneficiary entitled to a future interest in the trust property, until the interest fell into possession.

(3) No beneficiary as against whom there would be a good defence under this Ordinance shall derive any greater or other benefit from a judgment or order obtained by any other beneficiary than he could have obtained if he had brought the action and this Ordinance had been pleaded in defence.

**20.** Subject to the provisions of subsection (1) of the last foregoing section, no action in respect of any claim to the personal estate of a deceased person or to any share or interest in such estate, whether under a will or on intestacy, shall be brought after the expiration of twelve years from the date when the right to receive the share or interest accrued, and no action to recover arrears of interest in respect of any legacy, or damages in respect of such arrears, shall be brought after the expiration of six years from the date on which the interest became due.

Limitations of actions claiming personal estate of a deceased person.

## PART III.

EXTENSION OF LIMITATION PERIODS IN CASE OF DISABILITY, ACKNOWLEDGMENT, PART PAYMENT, FRAUD AND MISTAKE.

### *Disability.*

**21.** If on the date when any right of action accrued for which a period of limitation is prescribed by this Ordinance, the person to whom it accrued was under a disability, the action may be brought at any time before the expiration of six years, or in the case of actions to which the last foregoing section applies, one year from the date when the person ceased to be under a disability or died, whichever event first occurred, notwithstanding that the period of limitation has expired:

Extension of limitation period in case of disability.

Provided that—

(*a*) this section shall not affect any case where the right of action first accrued to some person (not under a disability) through whom the person under a disability claims;

(*b*) when a right of action which has accrued to a person under a disability accrues, on the death of that person while still under a disability, to another person under a disability, no further extension of time shall be allowed by reason of the disability of the second person;

(*c*) no action to recover land or money charged on land shall be brought by virtue of this section by any person after the expiration of thirty years from the date on which the right of action accrued to that person or some person through whom he claims;

Cap. 62.

33/1961.

(*d*)  this section, so far as it relates to the disability of infancy or unsoundness of mind, shall not apply to any actions to which the Public Authorities Protection Act applies, unless the plaintiff proves that the person under a disability was not, at the time when the right of action accrued to him, in the custody of a parent; and

(*e*)  this section shall not apply to any action to recover a penalty or forfeiture, or sum by way thereof, by virtue of any enactment, except where the action is brought by an aggrieved party.

*Acknowledgment and part payment.*

Fresh accrual of action on acknowledgment or part payment.

**22.**  (1)  Where there has accrued any right of action (including a foreclosure action) to recover land or any right of a mortgagee of personal property to bring a foreclosure action in respect of the property, and—

(*a*)  the person in possession of the land or personal property acknowledges the title of the person to whom the right of action has accrued; or

(*b*)  in the case of a foreclosure or other action by a mortgagee, the person in possession as aforesaid or the person liable for the mortgage debt makes any payment in respect thereof, whether of principal or interest;

the right shall be deemed to have accrued on and not before the date of the acknowledgment or payment.

(2)  The foregoing subsection shall apply to a right of action to recover land accrued to a person entitled to an estate or interest taking effect on the determination of an entailed interest against whom time is running under section 13, and on the making of the acknowledgment that section shall cease to apply to the land.

(3)  Where a mortgagee is by virtue of the mortgage in possession of any mortgaged land and either receives any sum in respect of the principal or interest of the mortgage debt or acknowledges the title of the mortgagor, or his equity of redemption, an action to redeem the land in his possession may be brought at any time before the expiration of twelve years from the date of the payment or acknowledgment.

33/1961.

(4)  Where any right of action has accrued to recover any debt or liquidated pecuniary claim, or any claim to the personal estate of a deceased person or to any share or interest therein, and the person liable or accountable therefor

acknowledges the claim or makes any payment in respect thereof, the right shall be deemed to have accrued on and not before the date of the acknowledgment or the last payment:

Provided that a payment of a part of the rent or interest due at any time shall not extend the period for claiming the remainder then due, but any payment of interest shall be treated as a payment in respect of the principal debt.

**23.** (1) Every such acknowledgment as aforesaid shall be in writing and signed by the person making the acknowledgment.

(2) Any such acknowledgment or payment as aforesaid may be made by the agent of the person by whom it is required to be made under the last foregoing section, and shall be made to the person, or to an agent of the person, whose title or claim is being acknowledged or, as the case may be, in respect of whose claim the payment is being made.

*Formal provisions as to acknowledgments and part payments.*

**24.** (1) An acknowledgment of the title to any land, or mortgaged personalty, by any person in possession thereof shall bind all other persons in possession during the ensuing period of limitation.

(2) A payment in respect of a mortgage debt by the mortgagor or any person in possession of the mortgaged property shall, so far as any right of the mortgagee to foreclose or otherwise to recover the property is concerned, bind all other persons in possession of the mortgaged property during the ensuing period of limitation.

(3) Where two or more mortgagees are by virtue of the mortgage in possession of the mortgaged land, an acknowledgment of the mortgagor's title or of his equity of redemption by one of the mortgagees shall only bind him and his successors, and shall not bind any other mortgagee or his successors, and where the mortgagee by whom the acknowledgment is given is entitled to a part of the mortgaged land and not to any ascertained part of the mortgage debt, the mortgagor shall be entitled to redeem that part of the land on payment, with interest, of the part of the mortgage debt which bears the same proportion to the whole of the debt as the value of the part of the land bears to the whole of the mortgaged land.

*Effect of acknowledgments or part payment on persons other than the maker or recipient.*

*33/1961.*

(4) Where there are two or more mortgagors, and the title or right to redemption of one of the mortgagors is acknowledged as aforesaid, the acknowledgment shall be deemed to have been made to all the mortgagors.

(5) An acknowledgment of any debt or other liquidated pecuniary claim shall bind the acknowledgor and his successors but not any other person:

Provided that an acknowledgment made after the expiration of the period of limitation prescribed for the bringing of an action to recover the debt or other claim shall not bind any successor on whom the liability devolves on the determination of a preceding estate or interest in property under a settlement taking effect before the date of the acknowledgment.

(6) A payment made in respect of any debt or other liquidated pecuniary claim shall bind all persons liable in respect thereof:

Provided that a payment made after the expiration of the period of limitation prescribed for the bringing of an action to recover the debt or other claim shall not not bind any person other than the person making the payment and his successors, and shall not bind any successor on whom the liability devolves on the determination of a preceding estate or interest in property under a settlement taking effect before the date of the payment.

(7) An acknowledgment by one of several personal representatives of any claim to the personal estate of a deceased person, or to any share or interest therein, or a payment by one of several personal representatives in respect of any such claim shall bind the estate of the deceased person.

(8) In this section the expression "successor", in relation to any mortgagee or person liable in respect of any debt or claim, means his personal representatives and any other person on whom the rights under the mortgage or, as the case may be, the liability in respect of the debt or claim devolve, whether on death or bankruptcy or the disposition of property or the determination of a limited estate or interest in settled property or otherwise.

Postponement of limitation period in case of fraud or mistake.

**25.** Where, in the case of any action for which a period of limitation is prescribed by this Ordinance, either—

(*a*) the action is based upon the fraud of the defendant or his agent or of any person through whom he claims or his agent, or

(*b*) the right of action is concealed by the fraud of any such person as aforesaid, or

(*c*) the action is for relief from the consequences of a mistake,

the period of limitation shall not begin to run until the plaintiff has discovered the fraud or the mistake, as the case may be, or could with reasonable diligence have discovered it:

Provided that nothing in this section shall enable any action to be brought to recover, or enforce any charge against, or set aside any transaction affecting, any property which—

(i) in the case of fraud, has been purchased for valuable consideration by a person who was not a party to the fraud and did not at the time of the purchase know or have reason to believe that any fraud had been committed, or

(ii) in the case of mistake, has been purchased for valuable consideration, subsequently to the transaction in which the mistake was made, by a person who did not know or have reason to believe that the mistake had been made.


## PART IV.

### GENERAL.

**26.** (1) This Ordinance and any other enactment relating to the limitation of actions shall apply to arbitrations as they apply to actions in the High Court.

Application of Ordinance and other limitation enactments to arbitrations.

(2) Notwithstanding any term in an arbitration agreement to the effect that no cause of action shall accrue in respect of any matter required by the agreement to be referred until an award is made under the agreement, the cause of action shall, for the purpose of this Ordinance and of any other such enactment (whether in their application to arbitrations or to other proceedings), be deemed to have accrued in respect of any such matter at the time when it would have accrued but for that term in the agreement.

(3) For the purpose of this Ordinance and of any such enactment as aforesaid, an arbitration shall be deemed to be commenced when one party to the arbitration serves on the other party or parties a notice requiring him or them to appoint an arbitrator or to agree to the appointment of an arbitrator, or, where the arbitration agreement provides that the reference shall be to a person named or designated in the agreement, requiring him or them to submit the dispute to the person so named or designated.

(4) Any such notice as aforesaid may be served either—

(*a*) by delivering it to the person on whom it is to be served; or

(*b*) by leaving it at the usual or last known place of abode in the Territory of that person; or

(*c*) by sending it by post in a registered letter addressed to that person at his usual or last known place of abode in the Territory;

as well as in any other manner provided in the arbitration agreement; and where a notice is sent by post in manner prescribed by paragraph (*c*), service thereof shall, unless the contrary is proved, be deemed to have been effected at the time at which the letter would have been delivered in the ordinary course of post.

(5) Where the High Court orders that an award be set aside or orders, after the commencement of an arbitration, that the arbitration shall cease to have effect with respect to the dispute referred, the Court may further order that the period between the commencement of the arbitration and the date of the order of the Court shall be excluded in computing the time prescribed by this Ordinance or any such enactment as aforesaid for the commencement of proceedings (including arbitration) with respect to the dispute referred.

Cap. 6.

(6) This section shall apply to an arbitration under the Arbitration Ordinance as well as to an arbitration pursuant to an arbitration agreement, and subsections (3) and (4) shall have effect, in relation to an arbitration under the Arbitration Ordinance, as if for the references to the arbitration agreement there were substituted references to such of the provisions of the said Act or of any order, scheme, rules, regulations, or byelaws made thereunder as relate to the arbitration.

(7) In this section the expressions "arbitration", and "award" have the same meanings as in the Arbitration Act, 1889, and the expression "arbitration agreement" has the same meaning as the expression "submission" in the said Act.

33/1961
52 & 53 Vict.,
c. 49.

**27.** For the purposes of this Ordinance, any claim by way of set-off or counterclaim shall be deemed to be a separate action and to have been commenced on the same date as the action in which the set-off or counterclaim is pleaded.

Provisions as to set-off or counterclaim.

**28.** Nothing in this Ordinance shall affect any equitable jurisdiction to refuse relief on the ground of acquiescence or otherwise.

Acquiescence.

**29.** (1) Save as in this Ordinance otherwise expressly provided and without prejudice to the provisions of section 30, this Ordinance shall apply to proceedings by or against the Crown in like manner as it applies to proceedings between subjects:

Application to the Crown.

Provided that this Ordinance shall not apply to any proceedings by the Crown for the recovery of any tax or duty or interest thereon or to any forfeiture proceedings under any law relating to duties of excise or to any proceedings in respect of the forfeiture of a ship.

(2) For the purposes of this section, proceedings by or against the Crown shall include proceedings by or against any Government Department or any officer of the Crown as such or any person acting on behalf of the Crown.

(3) Nothing in this Ordinance shall affect the prerogative right of Her Majesty to any gold or silver mine.

**30.** This Ordinance shall not apply to any action or arbitration for which a period of limitation is prescribed by any other enactment, or to any action or arbitration to which the Crown is a party and for which, if it were between subjects, a period of limitation would be prescribed by any other enactment.

Saving for other limitation enactments.

**31.** Nothing in this Ordinance shall—

Provisions as to actions already barred and pending actions.

(*a*) enable any action to be brought which was barred before the commencement of this Ordinance by an enactment repealed by this Ordinance, except in so far

484          **CAP. 43**)                    *Limitation.*

as the cause of action or right of action may be revived by
an acknowledgment or part payment made in accordance
with provisions of this Ordinance; or

(*b*) affect any action or arbitration commenced
before the commencement of this Ordinance or the title
to any property which is the subject of any such action or
arbitration.

# EXHIBIT B



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# England and Wales High Court (Chancery Division) Decisions

---

**You are here:** BAILII >> Databases >> England and Wales High Court (Chancery Division) Decisions >> CMS Dolphin Ltd v. Simonet &amp; Anr [2001] EWHC Ch 415 (23rd May, 2001)
URL: *http://www.bailii.org/ew/cases/EWHC/Ch/2001/415.html*
Cite as: [2001] EWHC Ch 415, [2002] BCC 600

---

[New search] [Help]

---

# CMS Dolphin Ltd v. Simonet & Anr [2001] EWHC Ch 415 (23rd May, 2001)

<div align="right">

**HC 99 04649**

</div>

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand
London WC2A 2LL

<div align="right">

Wednesday 23 May, 2001

</div>

<div align="center">

**Before**

**MR JUSTICE LAWRENCE COLLINS**

**Between**

</div>

CMS DOLPHIN LIMITED                                   **Claimant**

<div align="center">and</div>

**(1) PAUL MAURICE SIMONET**
**(2) BLUE (GB) LIMITED**                             **Defendants**

<div align="center">

**JUDGMENT**
**(Approved by the Court for handing down)**

</div>

Mr Gordon Bennett (instructed by Davenport Lyons) appeared on behalf of the Claimant.
Mr Thomas Croxford (instructed by Lewis Silkin) appeared on behalf of the First Defendant.

<div align="center">

Hearing: 27, 28 February, 1, 2, 5, 6, 7, 8, 9, 21 March 2001

</div>

## I Introduction

1. In early 1998 Kevin Ball and Paul Simonet, both of whom had businesses in the advertising and public relations sphere, formed CMS Dolphin Ltd. ("CMSD") as an advertising agency to be run by Mr Simonet and with financing to be arranged by Mr Ball. It operated from premises in Charing Cross Road with a small staff. Throughout it was underfunded, and tensions grew between Mr Ball and Mr Simonet. On April 16, 1999 Mr Simonet resigned as managing director and set up in business, first under the trade name Millennium, and later as Blue (GB) Ltd. ("Blue"), with his friend Bill Patterson, who had previously been chief executive of a company in the WPP group, the well-known international advertising agency. Following his resignation all of the staff of CMSD left to join Mr Simonet and Mr Patterson, and the principal clients whom Mr Simonet had introduced to CMSD switched their business to Millennium/Blue.

2. The case raises (among other questions) the existence and applicability of the principle (extending *Regal (Hastings) Ltd. v. Gulliver* [1942] 1 All E.R. 78; [1967] 2 AC 134n.) developed by the Supreme Court of Canada in *Canadian Aero Service Ltd. v. O'Malley* (1973) 40 D.L.R. (3d) 371, 382, that a director is disqualified from usurping for himself or diverting to a company with which he is associated a maturing business opportunity of his company not only while he is still a director, but also even after his resignation, when the resignation may fairly be said to have been prompted or influenced by a wish to acquire for himself the opportunity sought by the company.

3. CMSD claims that in breach of fiduciary duty, and in breach of his duty of fidelity under his contract of employment, Mr Simonet diverted parts of the business of CMSD and some of its business opportunities to himself and to Blue, and that Mr Simonet is accountable for any profit from the business which he diverted and also liable for damages for loss of a potentially lucrative contract to place advertising for a client (Debenhams plc) originally introduced by Mr Ball, but which CMSD was unable to service because of Mr Simonet's breach of contract. Blue is a defendant, but it is now in liquidation, and the proceedings against it are being discontinued.

4. Although CMSD claims substantial sums in this case for the loss of the clients and the business, one of the striking aspects of this case is that the evidence strongly suggests that for all their obvious abilities neither Mr Ball nor Mr Simonet has been able to establish and maintain a profitable business. CMSD was formed out of (in part) the business run by Mr Simonet's company, The Dolphin Agency Ltd., which went into liquidation in 1998, and the business run by Mr Ball's company Creative Marketing Solutions Ltd., which went into liquidation in early 1999. Blue ceased trading in September 2000 and has gone into liquidation with an estimated deficiency of £467,000. CMSD has no business apart from this litigation and the fact that it has had to provide security for costs tells its own story about its financial position.

5. In fact the documents and the oral evidence show that this litigation is driven more by the personal feelings between Mr Ball and Mr Simonet than by commercial considerations. Throughout I was struck by the fact that it has more in common with a domestic dispute than a commercial one, and that impression is confirmed by references in the documents to a "divorce" between Mr Ball and Mr Simonet. Each of them introduced a personal friend to the business, and each resented the other for that introduction. Mr Ball had since November 1998 sought the assistance of Mr Geoff Webb, a financial consultant, in advising on the financial situation of CMSD, and Mr Simonet had approached Mr Patterson in December 1998 as a possible partner and investor in the business.

6. In a number of important respects there is a conflict of evidence and I shall indicate at this stage my conclusions on the credibility of the principal witnesses, at which I have arrived not only by seeing them in the witness box but also by testing their evidence against the contemporaneous documents, and later documents, and the inherent commercial probabilities. The principal witnesses were Mr Ball, Mr Webb, Mr Simonet and Mr Patterson. Mr Ball is intelligent and charming, and his evidence was generally consistent with the documents and inherently believable, but in limited respects his evidence was less than wholly satisfactory, particularly when he denied that he had threatened to wind the company up in the course of discussions over the future of his involvement. Mr Webb, who gave evidence principally about the financial position of the company and Mr Simonet's attitude to him, was a solid and credible witness.

7. Mr Simonet is obviously a person of charm and considerable ability, and he is highly intelligent. He is plainly talented in his work and able to inspire confidence in clients and loyalty in staff. But I found him to be a very unsatisfactory witness. He was most evasive, and in many important areas I am satisfied that he gave untruthful evidence. Mr Patterson was also an evasive witness, and he gave unreliable evidence on a number of important matters concerning the steps which he and Mr Simonet took to ready themselves to carry on the business after Mr Simonet's resignation, and the discussions which they had about the future of the business. The other witnesses were Mr Simonet's father-in-law, Mr Ernest Sharp, an impressive and highly distinguished businessman, representatives of the clients of the company, and members of the staff. I shall deal with their evidence at the appropriate points in the narrative, although I should say at this stage that in my judgment the evidence of the staff was coloured by their loyalty to Mr Simonet.

## II The establishment of CMSD

8. Mr Ball's business was Creative Marketing Solutions Ltd. ("CMS"). It had been formed in 1994 by Mr Ball and Mr Nigel Stanton, and its main business was the staging of events for public relations purposes for its clients, mainly in the car industry. Mr Simonet had worked for the leading advertising agents Ogilvy and Mather, and when he set up in business on his own account it was through a company called The Dolphin Agency Ltd. ("Dolphin"), a small advertising agency. In 1997 CMS and Dolphin co-operated on a project for the White Knight group (which was in the used car insurance business), but following a major cutback in advertising by the client when its product performed poorly, and the failure to obtain anticipated business from the Car Group (a major used car retailer), Dolphin ran into financial difficulties and ceased trading in January 1998. CMS Dolphin was formed as a joint venture between Mr Ball and Mr Simonet. It was incorporated at the end of January 1998, and took over the assets and premises of Dolphin, when Dolphin was put into liquidation early in February 1998. The articles of association were Table A, with some amendments which are not material.

9. It was to be run by Mr Simonet as managing director, with Mr Jonathan Davies as the other executive director. Mr Ball and Mr Stanton were to be non-executive directors. The share capital of CMSD was to be £100. Mr Ball and Mr Simonet were each to have 40%, with Mr Ball to be responsible for the provision of finance and Mr Simonet to bring in the clients and do the work. Mr Stanton and Mr Davies were to have 10% each. But the share capital was never increased from £2 and the anticipated shareholders agreement was never entered into. Mr Ball's company CMS continued to trade, with Mr Stanton running it on a day to day basis.

10. Mr Simonet was on a salary of £70,000. By the time of the events which precipitated this litigation, the staff were Andy Cox, described as a creative director, and five more junior personnel: Dan Cole and Jo Smetham, a junior creative team, Aisling Mooney and Hugh Scotchbrook, account managers, and Justine Rosen, receptionist/secretary.

## III Funding

11. Mr Simonet perceived that one of the reasons for the failure of Dolphin had been inadequate capital. There was a meeting on January 20, 1998, at which the proposed venture was discussed. Those present at the meeting were Mr Ball, Mr Simonet, Mr Davies, Mr Stanton, and Mr Simonet's father-in-law, Mr Ernest Sharp. One of the matters discussed was the funding of CMSD. According to Mr Simonet, he and Mr Davies had estimated that the expenses would be about £20,000 per month, that it might take a year to break even, and that funding of up to £250,000 would be required. Mr Simonet says that Mr Ball said that he would put the required £250,000 into the business.

12. Mr Ball's position was that he agreed to arrange initial funding for CMSD; several figures were mentioned, from a top range of £250,000 to much lower figures. He says he asked Mr Simonet and Mr Davies to produce a detailed business plan supporting any funding requirement, but that at no time did he make a commitment to invest or provide £250,000, although in evidence he accepted that Mr Simonet might have thought that he would. In my judgment Mr Ball gave the impression that he would secure whatever finance was required. This was confirmed by the evidence of Mr Ernest Sharp, an impressive and well-known

businessman, who was managing director of Grand Metropolitan plc for 16 years. His evidence was that Mr Ball had agreed to provide funds to the extent of the required £250,000 either personally or by procuring finance from a bank against his personal security or that of one of his companies; that his commitment was not conditional on the production of a business plan satisfactory to the bank. A cash flow forecast was produced at the meeting, with projections for (probably) 18 months. That document does not survive, but it is very likely that (like other cash flow forecasts produced at that time) it proceeded on the basis (which was not satisfactorily explained) that the company would not produce any income at all for the period between June 1998 and November 1998.

13. Mr Sharp was not entirely persuaded by Mr Ball, and he advised Mr Simonet to proceed with caution, and advised him more than once to have the agreement reduced to writing, because Mr Ball struck him as being a bit sharp. No written shareholders' agreement was ever concluded, but a draft prepared by solicitors on Mr Simonet's instructions in July 1998 provides that the issue of shares to Mr Ball was to be conditional upon him having made available to the company bank finance guaranteed by him of not less than £200,000. I am satisfied that Mr Ball gave the impression to all concerned that he would be responsible for financing the company's cash flow requirements. But I do not consider that he would have made a firm commitment to the figure of £250,000 given the fact that the cash flow forecast had a significant gap, and his recollection that his commitment was known by Mr Simonet to be conditional on the production of a proper business plan makes commercial sense even if it was not made explicit at the meeting. It is not inconsistent with Mr Sharp's recollection that the production of a business plan was not discussed at the meeting, and is corroborated by the fact that a business plan was produced by Mr Simonet and Mr Davies shortly after the meeting. There is absolutely no basis for Mr Simonet's assertion (not made until after he had he left CMSD, in a letter of September 8, 1999, to CMSD's solicitors) that Mr Ball agreed to make an equity investment of £250,000, but that assertion, repeated unconvincingly in the witness box, supports the conclusion that there was no firm agreement. In any event, for reasons I shall mention below, Mr Ball's failure to meet expectations was of largely historical significance at the time of the crucial events in this case.

14. There is no doubt that tensions between Mr Simonet and Mr Ball grew as a result of (a) Mr Simonet's concern that Mr Ball was unable (and also unwilling) to procure finance to fund losses while clients were being acquired by Mr Simonet and being brought to fruition; (b) Mr Simonet's perception that Mr Ball was using CMSD to fund CMS; and (c) Mr Ball's perception that he was not being given sufficient information about the running of CMSD and that its financial controls were not adequate.

**IV Clients and the development of the business**

15. The initial client list included Argos, and Granada Sky, and Mr Simonet secured Reebok as a client. By the end of 1998 the clients also included the Cancer Research Campaign, Argos, Debenhams, and the publishers of a magazine called Smash Hits.

16. The February 1998 business plan said that in the short run the premises of CMSD would be 143, Charing Cross Road, but that subsequently they would seek new offices in a more prestigious location. The offices were in what I understood to be a rather seedy building in the worst part of Charing Cross Road. The revenue in the first quarter was less than £10,000, but £130,000 was billed in the second quarter, by which time expenses were about £150,000.

17. But there were severe funding difficulties. Mr Ball arranged overdraft facilities for CMS (secured on his personal shareholdings) and used the funds to finance CMSD up to about £80,000. CMS itself was in financial difficulties, the reasons for, and nature of, which were not explored at trial. It became clear to all parties that if CMS failed, CMSD would also fail because the liquidator of CMS would require repayment from CMSD of advances made by CMS, and CMSD was in no position to repay. In June 1998 Mr Simonet thought that Mr Ball was using CMSD to fund CMS, and he instructed the bank not to make any payments to CMS. In July and August 1998 Mr Simonet pressed Mr Ball to procure CMS to guarantee bank funding (of £250,000) for CMSD, but this was not forthcoming.

18. Mr Ball became concerned (he says from June 1998) about the financial controls in CMSD, and in late October he sought the advice of his friend Mr Geoff Webb. Mr Webb is an accountant who has for several years worked as a consultant in financial services, investment banking and commerce. Mr Ball asked Mr Webb to review the operations of CMS and CMSD. Mr Webb quickly concluded that cash flow was in a poor state in both companies, that they had traded poorly in 1998 and had incurred significant losses. His judgment was that they were only continuing to trade on the basis of tolerant creditors and the prospects of future profitable trading.

19. Mr Ball was also concerned at the results of an investigation of the books of CMSD by his book-keeper Mr Muir in November 1998. Mr Muir reported to Mr Simonet and Mr Stanton that an informal internal audit had revealed that there was a significant amount of missing information and incorrect actions taken. When Mr Muir wrote to Mr Webb on December 8 attaching the November management accounts he said that it seemed that with every turn he found yet more areas where his doubts were raised about whether he was reporting the true position of the company, and that "the total mess" had taken longer to sort out than expected.

20. By the end of 1998 it had become clear that there was no question of Mr Ball producing £250,000. On November 26, 1998 Mr Simonet wrote to Mr Ball referring to a conversation in which Mr Ball had promised to get his solicitors to come up with a form of words that formally guaranteed the funding of CMS Dolphin by CMS, and suggesting a form of wording to guarantee up to £80,000. A paper produced by Mr Davies in January 1999 said: "…CMS Dolphin has operated under significant financial constraint if not distress. Of the intended funding facility of 250K, only 75K has been available." A balance sheet prepared on December 8 showed a deficiency of £118,000. By the end of December 1998 accumulated losses were almost £160,000.

**V The alleviation of the immediate crisis**

21. By late 1998/early 1999 it had become apparent that unless something was done CMSD would have to go into liquidation. Mr Ball had concluded that it would not be possible to introduce fresh capital from his contacts and those of Mr Webb, and that he could not support both CMS and CMSD. He decided to support CMSD and allow CMS to go into liquidation. What alleviated the immediate crisis in January/February 1999 included the following: (a) Mr Simonet wrote a memorandum to his fellow directors on January 3, 1999 affirming his commitment to CMSD, expressing the view that liquidation was not necessary, that the creditor position was manageable, that "the work of the last 11 months, particularly the last 3 months, is about to bear fruit", and that new investor funds could be found; (b) Mr Ball secured a loan of £100,000 from a friend in mid-January, and lent on the money to CMSD, which in turn repaid about £75,000 to CMS; (c) Mr Ball allowed CMSD to enter into a contract with the Cancer Research Campaign ("CRC") in respect of work which Mr Ball was negotiating for CMS; (d) there was greater optimism concerning future prospects with existing and prospective clients including Argos, Reebok, EMC2, Debenhams and Delaney Fletcher Bozell ("DFB"), and, according to Mr Simonet's memorandum, there was scope for doubling or trebling the income from CRC, Argos, EMC2, and Reebok, there was likely business from *(inter alia)* Debenhams and the publishers of Smash Hits, as also from DFB which, he said, should prove fruitful from a cash flow and resource point of view.

22. After CMS ceased trading, Mr Ball (who had until then had his office in Guildford) established an office at CMSD, although it seems that he was not often there. It is clear from contemporaneous documents that it was envisaged that he would receive a salary from CMSD, but there is a conflict of evidence on the question whether that was finally resolved. Jonathan Davies left the company in February.

23. The tensions, however, between Mr Simonet and Mr Ball were not resolved. Mr Simonet was resentful that Mr Ball had not provided the financing which Mr Simonet had been led to believe he would, and because Mr Simonet was doing the creative work and obtaining most of the clients. Mr Ball was concerned at the lack of financial controls, and resentful of the fact that, as he perceived it, he had put a lot of money into the venture and was getting nothing out of it.

24. There is no doubt that the business was picking up. A number of significant new projects were obtained between January and March 1999. Although it had incurred losses of about £160,000 to end-December 1998, figures produced by Mr Webb in connection with this litigation show that it made a net profit of £84,000 in the period from January 1, 1999 to April 16, 1999, when Mr Simonet left, and confirm what Mr Simonet had said on January 3 that the work of the previous 11 months was about to bear fruit.

## VI The clients

### Argos

25. Mr Simonet had done work for Argos, the major catalogue retailer, while he was at Ogilvy and Mather. Argos was also a client of his company, The Dolphin Agency Ltd., and had also commissioned some work from CMSD. His principal contact at Argos was Neil Swanson, who from November 1998 was brand manager for Argos Direct, a home shopping project. In early 1999 Argos was seeking to appoint an advertising agency for Argos Direct, and after Mr Simonet met the marketing director, Mr Simonet and Mr Swanson negotiated terms for the retainer of CMSD. Mr Swanson's original proposal in February was that CMSD should be paid a monthly retainer of £5000 for 12 months (subject to 3 months notice), together with a commission rate of 4% of money spent on media advertising, and production work at cost. Mr Simonet proposed instead an all-in monthly fee.

26. On March 4, 1999 Mr Swanson sent a fax to Mr Simonet at CMSD referring to Mr Simonet's proposal of a commission fee of £9000 per month, and proposing instead £8000 per month. Precisely what services would be offered and what consultancy would be extra were to be discussed. Subsequently it was agreed that the fee would be £8000 per month for 12 months as from January 1, 1999 with unlimited access to Mr Simonet's consultancy on any project. There is no reason to suggest that there was any change to the original proposal that the notice period was to be three months.

### Reebok

27. Mr Michael Price of Reebok (UK) Ltd., the sportswear manufacturers, had known Mr Simonet since about 1995, and in the course of 1998 Reebok employed CMSD to conduct a limited press and point of sale campaign for Reebok Classic clothing. In late 1998 or early 1999 Reebok retained CMSD to conduct three small projects, relating to Women's Fitness Strategy, the London Marathon 1999, and Reebok Classics footwear research. CMSD was to be paid £5000 per month for each of the months January, February and March 1999, together with payment for production material on which CMSD made a profit. A January business plan estimated that there would be a minimum of £50,000 revenue over the following six months.

28. Although Reebok was an important connection from the point of view of CMSD, and £50,000 over six months was equivalent to more than 15% of CMSD's turnover, from Reebok's point of view it is plain that these were all relatively small projects. For major projects Reebok used a large advertising agency, Lowe Howerd Spink.

### DFB

29. DFB was a small advertising agency. In 1998 its business director and head of client service was Paul Cowan, who had worked with Mr Simonet at Ogilvy and Mather, and had been a friend of his since the early 1990s. Mr Cowan and Mr Simonet agreed towards the end of 1998 to co-operate in seeking business from the film and video distributors, CIC International, relating to publicity for video films being marketed by CIC. In January 1999, DFB, with the assistance of CMSD, won the business, with the client insisting that Mr Simonet should be involved in the work. CMSD did the below the line work.

30. The terms on which CMSD would participate as sub-contractor were set out in a letter dated March 1, 1999 from the finance director of DFB. He wrote to confirm terms which had been agreed between Mr Simonet, Paul Cowan and Mark Lund (the then managing director of DFB). The terms were that CMSD would provide all trade related non-advertising material for CIC Video with effect from February 4, 1999.

There would be a 3 month notice period. The fees would be £150,000 for the first 12 months payable in part monthly, in part quarterly, and in part per project, together with 26% of any incentive paid by CIC to DFB, and payment for production expenses at cost.

31. The letter ended by saying that, on the assumption that everything was correct, a contract would be drawn up for review by Mr Simonet. No such contract was executed. In evidence which I accept, Mr Cowan said that Mr Simonet had ideally wanted different terms from those set out in the letter but he did agree with those terms; Mr Simonet did not press for a formal agreement and they proceeded on the basis that the agreement was as in the letter.

**Debenhams**

32. Mr Terry Green, who had been chief executive of the stores group Debenhams since 1992, had been a friend of Mr Ball since 1996. In January 1999 Mr Ball introduced Mr Simonet to Mr Green. Mr Simonet proposed that CMSD provide a "vision programme" to Debenhams personnel. This was a process designed to evaluate the need for marketing communications and prepare creative solutions with the involvement of Debenhams executives. In January 1999 Mr Hugh Bradley, the Visual Communications director, wrote to Mr Ball to confirm acceptance of the proposal. The fee was to be £25,000, with an immediate payment of half and the balance after completion of what was called a "Vision Day." This was to have been done by March/April but was never completed. It was plain to all concerned that if the presentation had been successful the contacts with the executives would have given CMSD some advantage in securing the agency work for any advertising projects which were developed as a result of the "Vision Day."

**Cancer Research Campaign**

33. This was a contact of Mr Ball, and the work was originally obtained by him for CMS. But he allowed CMSD to enter into the contract in early 1999. The expected minimum revenue was £150,000. For reasons which were not explored at trial, the contract was not going well by April 1999.

**VII The events of early 1999 and Mr Webb and Mr Patterson**

34. On January 8, 1999 Mr Simonet and Mr Davies procured the incorporation of a company called Dolphin (GB) Ltd. Mr Davies was registered as a director and Mr Simonet as secretary. A letter from Lloyds Bank of January 28, 1999 shows that (a) Mr Simonet had supplied the bank with bank statements of CMSD and (b) Mr Simonet was arranging for an account in the name of the company to be opened. In fact the account was not opened and the company was not subsequently used by Mr Simonet. The evidence of Mr Simonet was that the company was formed because he was afraid that Mr Ball would force CMSD into liquidation.

35. From December 1998 Mr Simonet had been having talks with Bill Patterson, whom Mr Simonet had known for about 15 years, and who had been chief executive at Landsdown Conquest Ltd., an advertising company in the WPP group, until the end of December 1998. At that time Mr Simonet approached him and asked him if he would be interested in joining Mr Simonet at CMSD. On about January 14, 1999 Mr Patterson responded to Mr Simonet's approach on his return from holiday, and told Mr Simonet that he had decided that he wanted to work towards joining Mr Simonet at CMSD. Mr Patterson attended a meeting at CMSD to prepare for a presentation to potential clients, at which Mr Ball was present. Mr Simonet told Mr Ball that Mr Patterson could be a potential partner in CMSD. Both Mr Simonet and Mr Patterson say that Mr Patterson was not favourably impressed by Mr Ball or his professional abilities.

36. In late January/early February Mr Patterson retained, in his own name, estate agents (Adams Burnett) to secure a lease at 13 Manette Street, comprising 1,586 sq. ft. of newly refurbished office accommodation. Subsequently Adams Burnett pursued another property, in Golden Square, and on March 31, 1999 heads of terms were agreed between Adams Burnett and Lambert Smith Hampton (acting for the lessor, Fintex) for the first, second and third floors of 19 Golden Square, comprising 1,832 sq. ft. at a rental of £67,620 per annum, beginning on August 1, 1999, with a rental deposit for the first year equivalent to 12 months rent, reducing in subsequent years. In this document Adams Burnett were said to be acting for "Dolphin Advertising." Mr Ball

was not told about these matters. Mr Patterson's evidence was that the initial approach was made on his own account, and that he was looking for premises to launch a new company. Mr Simonet's evidence was that Mr Patterson was negotiating for premises for CMSD on behalf of Mr Simonet, that there had not been a deliberate decision not to tell Mr Ball, but that he had not felt it appropriate to tell Mr Ball because they did not discuss everything, and that Mr Simonet had not been aware that the heads of terms had been signed, merely that terms had been available.

37. In mid-February Mr Simonet suggested to Mr Ball that a new partner should come into CMSD with a share of the equity to be derived from Mr Ball's 40% in the proportion that Mr Ball had failed to deliver on the promised £250,000. Mr Ball reacted very unfavourably to this suggestion which he regarded as an attempt by Mr Simonet and Mr Patterson to take over CMSD. In a memorandum of February 16, Mr Ball told Mr Simonet that he had persuaded Geoff Webb to come on board to ensure that they were given the correct financial information to make the right strategic decisions. If the company did require further funding or loan capital he had already said that he was prepared and able to source it. He could not make that decision without being in possession of the full facts. He suggested that the next steps were to establish the exact financial position of the company, to put in place the necessary financial arrangements to secure the company as a viable ongoing business, to appoint Geoff Webb as financial director, and agree a strategy for repaying money loaned to the company by Mr Ball. He said he would not carry on unless they were working together closely with all trust and respect for each other. Mr Simonet's reply was non-committal, and in his witness statement he says that by this time he had concluded that Mr Ball was not an appropriate partner.

38. In early March, there were discussions between Mr Ball, Mr Simonet and Mr Webb about Mr Webb joining CMSD on a part-time basis as a financial controller as from Monday March 15, 1999. Mr Simonet says he did not agree to this, but I am satisfied on the evidence of Mr Ball and Mr Webb that Mr Simonet did agree, although he did tell Mr Webb at the time that he should not make any long terms plans concerning CMSD. But when Mr Webb did come to take up his position, Mr Simonet reacted strongly against it. According to Mr Webb, Mr Simonet told Mr Ball that "it was all over" and that he wanted to work with Mr Patterson. When Mr Simonet told Mr Webb that his services were not required, Mr Webb left the office. I accept Mr Webb's evidence of this conversation, and reject Mr Simonet's denial.

39. In the week beginning March 22, the tensions became more acute. In the course of that week there were several discussions between Mr Simonet, Mr Ball and Mr Patterson. Mr Ball's initial position was that all three could work together. But ultimately he made it clear that he would reduce his shareholding and leave the company to Mr Simonet and Mr Patterson if they repaid the £100,000 he had lent. It is probable that he threatened to wind up the company if there were no resolution of the crisis.

40. On March 22 Mr Simonet left cheques with Mr Ball to sign, including a cheque to himself for £4,101.73 (for his March salary), and staff salary cheques. Mr Simonet insisted that Mr Ball should sign the cheques, but Mr Ball's reaction was to refuse to sign the cheques until the issue of his interest was resolved: I accept the submission for Mr Simonet that Mr Ball was using the signing of the cheques as a negotiating tactic, and not (as he later claimed) because of advice which he had received that the company was insolvent. I also accept Mr Simonet's evidence that it was in this context that Mr Ball said to Mr Simonet: "I will not fund you and Bill in business." Ultimately Mr Ball signed the cheques on March 29. But he refused to sign Mr Simonet's salary cheque unless Mr Simonet signed a cheque in favour of Mr Ball, and I accept Mr Ball's evidence that in substance they agreed to leave the question of salary pending the outcome of their discussions on the future of the company.

**VIII April 1999**

41. The position at the beginning of April was that Mr Patterson had already, without the knowledge of Mr Ball, signed heads of terms for the Golden Square premises to be taken in August in the name of Dolphin Agency. Also, there were firm contracts with Argos and DFB guaranteeing a source of income until the end of 1999 (and, as will appear, that was not known to Mr Ball), and in addition there was substantial but unbilled work in progress which would have alleviated the cash flow position if it had been billed promptly. There was, however, an impasse in the discussions because Mr Ball's main condition for the introduction of

Mr Patterson was the repayment of his £100,000 loan, and Mr Patterson was not prepared to fund an immediate repayment of the loan. Throughout the negotiations both Mr Ball and Mr Simonet threatened to put the company into liquidation, but I am satisfied that neither had any intention of doing so, and I doubt whether either took the other's threat seriously. For Mr Ball it would have meant that he would never be repaid the £100,000 loan, and for Mr Simonet it would have meant that he would have been involved in two successive failures and that a liquidator would have control of the goodwill of the business.

42. On April 1 (the day after the heads of terms for the Golden Square premises had been signed) Mr Simonet wrote to Mr Ball four letters. The most significant points made by Mr Simonet in these letters were these: Mr Ball's refusal to sign cheques to creditors had been a breach of his duties as a director; Mr Ball's behaviour had led Mr Simonet seriously to reconsider his position as a director, and it was irresponsible for them as directors to continue to trade; the appointment of Mr Webb had been made totally without reference to him as a director or to the board; and Mr Ball's failure to respond to the proposals for a "divorce" left Mr Simonet with no choice but to ensure that thenceforth he acted properly as a director of a company without further reference to Mr Ball as a partner. This was a threat to wind up the company. There was an inherent inconsistency in Mr Simonet's position throughout this period. He was able to press for payments when it suited him, but also to suggest that the company could not trade or that it should be put into liquidation because it was insolvent.

43. On April 6 Mr Ball's long handwritten response called for a resolution of the matter by the end of the week "otherwise matters will be taken largely out of our hands". He was prepared to leave the company, but to continue to introduce potential clients and new business, in return for (based largely on previous conversations with Mr Patterson) the immediate repayment of £100,000 loan, and of legitimate expenses incurred in working for the previous 12 months, and an immediate payment of £10,000 for work done to date in securing the CRC and Debenhams' business, the sum of £5,000 per month to handle those ongoing elements, a percentage of all revenue from CRC/Debenhams (say 30% for 3 years), and a 20% preference share in the company (or new company).

44. Mr Ball and Mr Simonet met on April 7, and after that meeting Mr Ball wrote another letter stating that despite their best efforts it appeared that they still did not have an agreement in place. He said that it was not right to commit the company to any further expenses while this state of limbo existed: "As you implored me not to bring about the disaster scenario so I say the same to you." It appeared that a major hurdle was the timing of the repayment of his loan, and he did not see why Mr Simonet and Mr Patterson should have the benefit of the money which he had lent. On April 8 Mr Ball wrote to say that in line with their directorial responsibilities it was now their legal responsibility not to incur any more expenses on behalf of the company and to prefer no creditor.

45. On April 8 Mr Simonet put forward a without prejudice proposal that Mr Ball would receive £100,000 in 4 instalments of £25,000 over the following 9 months. The timing of the payment was contingent upon the maintenance of the CRC contract, and any failure on the part of Mr Ball to maintain it would result in the extension of the payment intervals from 3 to 6 months. He would receive for a period of 3 years 20% of the net profit, and 100% of the revenues that accrued from the agency's percentage of staging profitable events for the CRC, and 30% of revenues from future projects with Debenhams (not including the already agreed £25,000).

46. Mr Ball interpreted this offer as meaning that it would be years before he would get his money back, since there were problems with the CRC contract. On April 8 Mr Ball replied "We are clearly poles apart ... I require my loan to be repaid to me along the lines of our previous discussion and dependent on nothing else other than it is owed to me. I have briefed my legal team who are willing to take matters further on my behalf - or you and I can save ourselves the money by doing it ourselves - I leave that choice to you." Mr Ball denied that this was a threat to have the company wound up, and said that the reference to the legal team taking matters further on his behalf was a reference to them drawing up an agreement to implement a settlement. In my judgment this was a threat to wind up the company, and would have been so understood by Mr Simonet. But equally in my judgment it was bluff, and Mr Simonet would have known that too.

47. There was a board meeting on April 12. Those present were Mr Ball and Mr Simonet. Mr Stanton was on holiday. The note of the meeting records that Mr Ball informed the meeting that the proposals from Mr Simonet and Mr Patterson were not acceptable. According to the note, Mr Ball asked Mr Simonet to give the meeting an update on Argos, Reebok and CIC Video. As recorded, Mr Simonet's answer was plainly crafted to give the impression that there were no binding agreements with Argos and DFB, and to avoid revealing that they ran to the end of 1999 and required notice of termination.

48. In relation to Argos, he is recorded as having said: "P.S. informed the meeting that he was in the process of formalizing the written contract with Argos. An agreement was pending." In fact Argos had set out the essential terms in a fax of March 4, and any additional points had subsequently been agreed. No formal contract was envisaged. He also correctly stated that Argos had agreed a retainer of £8000 per month from January 1, 1999 without saying that it was for twelve months: it was also implicit in the Argos correspondence (as a result of the opening letter) that it was subject to 3 months notice, and he did not mention that either.

49. With regard to CIC Video, he informed the meeting that no contract had been formalised with CIC/DFB. That was misleading in that all the terms had been set out in a letter of March 1, 1999, and there is no reason to believe that any party envisaged by April that the formal contract referred to in that letter would be executed. Nor did he say that the arrangement was firm for the whole of 1999, subject to 3 months notice.

50. Mr Simonet then produced a written statement calling for the liquidation of the company, and the meeting adjourned for Mr Ball to seek legal advice. Mr Simonet's written statement (on headed memorandum paper of his solicitors Lewis Silkin) stated that Mr Ball had said in writing that they were no longer able to meet their liabilities in the current situation and Mr Simonet now agreed. He therefore had a concern about his personal liability for wrongful trading. In order to protect them, and the company, he resolved that they immediately notify the bank and unless Mr Ball agreed to a voluntary liquidation, he would file a petition himself as the only responsible thing to do.

51. After the board meeting Mr Simonet called the company's bank and said he would petition for winding up, because it was the appropriate thing to do. He did not carry out his threat because, in my judgment, it was never intended to achieve anything other than to put pressure on Mr Ball.

52. Later on April 12 Mr Ball wrote a hand written letter to Mr Simonet stating that he agreed that should he call for his £100,000 loan to be repaid then the company might be in a position of wrongful trading, but he had not done that. The facts were that there was a substantial amount of work in progress and outstanding invoicing which only Mr Simonet could bring up to date and that a proper financial audit had to take place in order to be accurate about the position. If there was no reasonable prospect of the company avoiding insolvent liquidation then they had to stop trading immediately. In line with his request at the board meeting it was necessary for Mr Simonet to prepare a report detailing the status of the work in progress and financial status of all their clients in order that the board could make a correct decision about the future of the company. The board had to be in possession of the full facts before deciding whether to inject more funds etc. In my judgment Mr Ball's response, which involved a full investigation of the finances of the company and Mr Ball staying on, was the last thing Mr Simonet wanted.

53. In a letter of April 13 Mr Ball said that based on all the available information Nigel Stanton and he believed that the company was not trading wrongfully and intended to carry on trading for the foreseeable future; that a detailed financial examination would reveal the precise and accurate situation; and that Mr Simonet's assessment of the value of the fees owed to the company provided by him at the board meeting on April 7 gave Mr Stanton and Mr Ball the degree of comfort necessary to continue trading. They proposed instigating a complete internal financial audit, involving the employment of Mr Muir and Mr Webb. He said they were obviously not in a position to prevent Mr Simonet from carrying out the action contained in his prepared statement, but they would advise him that they did not believe this action would be taken in the best interests of the company or its shareholders. The letter ended as follows:

"You may feel that your position at CMS/Dolphin Ltd is now untenable and we are prepared to accept your resignation from the board immediately. Should you wish to remain as a director of the company we both assume that it is with the intention of always acting in the best interests of the company and that you will not under any circumstances jeopardise relationships with staff and external relationships with clients. Furthermore, that you will co-operate fully with Peter, Geoff, Nigel and myself in bringing contracts and invoicing up to date immediately."

54. On April 12 or 13 Mr Simonet telephoned Regus (a property company which lets out furnished office accommodation) about renting office space. Mr Simonet and Mr Patterson said that the initial approach to Regus was made by Mr Simonet because of a concern that Mr Ball might force Mr Simonet to leave CMSD, thereby leaving him with no employment and means of earning money, and he sought information as to availability of office space in the event that he was forced to leave CMSD.

55. Mr Simonet's evidence was that, having taken legal advice, on Thursday April 15 he decided to resign.

**IX Events of April 16**

56. There was a board meeting in the morning of April 16. Those present were Mr Ball and Mr Simonet. Mr Stanton was away on holiday, and Mr Ball had been appointed as his alternate. Mr Simonet produced two documents to the meeting. One was a "without prejudice" memorandum in which he said:

"I write in response to Kevin's suggestion that I should resign immediately. I must confess that this is an unpleasant alternative I had not considered until your suggestion Kevin."

Mr Simonet proposed that he should "resign (as a director and as an employee) with immediate effect"; the company would pay him his January and March salaries and reimburse him for other expenditures undertaken personally on behalf of the company (estimated at £7,500); he would waive all claims as a creditor; he would assign his shareholding to Mr Ball; Mr Simonet would be entitled to use the Dolphin name; the company and Mr Ball would agree concerning the clients that (a) the company would keep all revenues whether invoiced or not in respect of the period to April 1, 1999, and (b) the company would retain CRC and Debenhams, whilst Argos, Reebok and DFB "allowed smooth transfer to new P.S. company." He required an answer by close of business that day. Mr Ball's evidence (which I accept in preference to Mr Simonet's denial) was that Mr Simonet warned that "things will get nasty" if his proposal were not accepted.

57. The second document was a memorandum dated April 16 about the current financial position of the company. The most relevant points made in that memorandum were these: (a) there was an excess of liabilities over assets of some £160,000; (b) the assets, including invoiced amounts due from Argos, Reebok and DFB/CIC, were £131,000, but the Argos revenues had significant associated costs which were not yet shown as creditors; (c) the liabilities included what were described as loans from Mr Ball (£100,000) and Mr Simonet (£17,500), and Mr Simonet said that approximately £150,000 of the creditors were imminent, which dramatically outweighed cash at bank. He went on:

"The agency only has one confirmed contract that guarantees a monthly revenue."

He said that Mr Ball's outright rejection of his proposal (of April 8, with stage payments of Mr Ball's loan) had put them in a position of wrongful trading unless there was some other plan of which he was ignorant.

58. This is a revealing document. Mr Simonet was painting as bleak a picture as possible. His reference to there being only one confirmed contract was a reference to the CRC contract. In fact, there were confirmed contracts with Argos and DFB, and the prospect of work from Reebok. Figures calculated by Mr Webb (and not challenged) indicate that CMSD had £139,000 of unbilled work in progress; and made a net profit of £84,000 in the period from January 1 to April 16, 1999. Mr Simonet's reference to his "loan" of £17,500 was a reference to his salary for January and March 1999. In one of his letters of April 1 he had also referred to his "lending the company money in order to pay its creditors to ensure the maintenance of the business,"

which was also a reference to salary. In the witness box he said that the description of the unpaid salary as a loan was "ironic." He also insisted that the profit of £84,000 for the first quarter of 1999 was a freak result.

59. The board minutes were drawn up by Mr Ball's solicitors, Davenport Lyons, but were based on Mr Ball's handwritten account, and there is no reason to doubt their accuracy. They record that Mr Ball undertook to review the proposal and respond after due consideration, but that he said that Mr Simonet's request that a response be received by close of business that day was unrealistic.

60. The other matters dealt with at the board meeting were the appointment of Mr Webb as financial controller, to ascertain the accurate and complete financial position of the company and to recommend appropriate on-going strategy. It is now accepted that the board minutes accurately reflect Mr Simonet's agreement to the appointment, although in subsequent correspondence (and in these proceedings) Mr Simonet denied that he had ever agreed to the appointment of Mr Webb, and asserted that Mr Webb's appointment was a humiliating demotion. The other resolution (which was adopted after "voting" - and not "noting", as the typescript suggests - i.e. against Mr Simonet's objection) was that the bank mandate should be altered to allow any two directors to sign cheques. This removed the need for Mr Simonet's signature on cheques but did not remove him as a signatory. Mr Ball's evidence, which I accept, was that this was a defensive measure to prevent Mr Simonet from having an effective veto on any payments in view of his threat to wind up the company.

61. Later that day, Mr Simonet and Mr Patterson visited the Regus offices and rented space for the following week. Mr Patterson's witness statement said that they visited the Regus offices after Mr Simonet had tendered his resignation. But both of them went to the pub for the farewell drinks in the evening after the resignation, and I accept Mr Simonet's evidence that they took the space over an extended lunch break.

62. When they met at about 5.30 p.m., Mr Simonet said he was leaving. That was in response to, according to Mr Ball, his statement that he needed more time to consider the proposal, or, according to Mr Simonet, Mr Ball's rejection of the proposal. I believe Mr Ball's account. Mr Ball telephoned Mr Webb and asked him to come to his office, and at 5.45 p.m. Mr Webb arrived and Mr Ball told him what had happened. Mr Simonet was talking to the staff (except Dan Cole, who was not in the office that day) in the board room. Mr Simonet had told the staff that it was with regret that, as a result of recent events, and in accordance with the wishes expressed in Mr Ball's letter to him, he resigned both as an employee and as a director with immediate effect. Mr Webb advised Mr Ball to speak to the staff and after Mr Simonet left he did so in an effort to persuade them to stay with CMSD. It was made absolutely clear to the staff by Mr Simonet and Mr Patterson at the meeting and at the leaving drinks at a nearby pub after the meeting that there would be jobs for them with Mr Simonet and Mr Patterson.

63. In the week of April 12 the company had been a busy agency, with artworks and desks packed with the work product. On Monday 19 April it was desolate and empty, with the desks relatively clear, and the working models had gone. By the following day it had no staff.

## X Events following departure

### A. Staff

64. In substance the staff had been offered jobs by Mr Simonet and Mr Patterson on the Friday, but each of them was careful to tell Mr Ball or Mr Webb that they were leaving CMSD before they confirmed to Mr Simonet that they were joining him. By Monday, April 19 Mr Patterson had prepared a draft letter confirming that Mr Simonet and he would like the employees to join their new company, currently called "Millennium," in the same capacity and on the same terms as their jobs at CMSD. On that day, Dan Cole and Jo Smetham (the junior creative team) went into the CMSD office shortly before attending a regular meeting with DFB. They say that over lunch they decided to leave CMSD. They informed Mr Ball and Mr Webb of their decision, and when Mr Simonet went to the office to collect his things they say that they told him that they wanted to work for him. Hugh Scotchbrook, an account manager, and Justine Rosen, a receptionist/secretary, also resigned on April 19. Andy Cox, the creative director, tendered his resignation on Tuesday April 20,

when it became apparent that CMSD had no business and when the person who, Mr Ball said, would be his new partner failed to turn up at the office. Aisling Mooney, an account manager, had gone to the United States at the weekend. When she came back to London on Tuesday, April 20, she was told by Ms Smetham that she and Dan Cole had resigned and joined Mr Simonet and Mr Patterson at Millennium. Ms Smetham also told her that Reebok and Argos had switched their business to Millennium, which meant that Ms Mooney had no job left at CMSD. She went to CMSD's offices and told Mr Ball and Mr Webb that she was resigning, because there was nothing for her to do at CMSD.

65. Mr Simonet accepted that he had told the staff on April 16 that they were all welcome to join him. Although several of the employees (for example, Mr Cole) stressed that they resigned before communicating to Mr Simonet that they wished to work for him, I have no doubt that they all knew that there would be jobs for them at Millennium, and that Mr Simonet well knew that most would join him. Ms Smetham recalled that Mr Patterson said that they would have a home with Mr Simonet and Mr Patterson if they wanted one, and Ms Mooney's evidence was that Mr Simonet told them that there would always be a place for the staff with him. Nor did they have any doubt that the clients would follow Mr Simonet. Mr Cowan of DFB was at the farewell drinks at the pub, and Mr Scotchbrook made a claim in the industrial tribunal in which he stated that on April 16 he was told that Mr Simonet had resigned and that he would most likely take the clients on whose business he was working away from the company. Ms Mooney was told at 8.30 a.m. on Tuesday, April 20, that Argos and Reebok had moved, which is confirmed by invoices from Blue referring to estimates given on April 20 to Argos, and Mr Scotchbrook accepted that it was obvious that the three accounts would follow Mr Simonet. The employees would not have resigned unless they knew they would have work.

## B. CMSD

66. After the departure of Mr Simonet and the employees, CMSD had no staff, and Mr Ball was not an advertising man. He was not in a position to recruit new staff, in particular because the company did not have a client base sufficient to attract high calibre staff. Mr Ball endeavoured to retain the Debenhams connection. On April 27 Mr Ball wrote to Debenhams, emphasising his intention to carry on trading, but he was not able to complete the Vision Day project as a result of Mr Simonet's departure. Accordingly Debenhams did not pay the balance (£12,500) of the £25,000 fee, but they did not seek repayment of the £12,500 paid in advance for the project, which they offset against fees in relation to proposals for a sponsorship of Paul Nicholls Racing and National Hunt racing in general.

67. Debenhams were proposing to spend £3 million on a brand building exercise. Mr Green agreed that CMSD be included on short list of agencies to pitch for the work. Mr Ball was not able to pitch for the business by the deadline of June 14 due to the problems at CMSD and his inability to enter into alliances with other agencies. Debenhams gave him an extension until July 16 to pitch for the work in association with OTM/Maxim, a design consultancy and marketing communications production house, who had introduced Mr Ball to a marketing consultant, Rick Holmes.

68. On July 23 Mr Green wrote to Mr Ball to say that the quality of the strategic thinking and creative work in their presentation was exemplary; and that there had been a great deal of internal debate and discussion in Debenhams with a view to appointing the company to handle all or part of the premium advertising campaign, in particular the £3 million brand building exercise planned for the autumn of 1999. But the board had taken the position that, due to the present uncertainty which existed at CMSD in respect of staffing levels and the dispute with Mr Simonet and others, it was unrealistic to award them the business at that time. Mr Green's evidence was that the final decision not to appoint CMSD was taken by him, and that had the internal resources and capabilities of CMSD not been decimated by the events of April 16 he would have appointed CMSD to handle all or a very substantial part of the campaign. Mr Bradley's evidence was that the ideas that would have been developed at the Vision Day may have led to the employment of CMSD to implement the communications programme, a decision that would have been taken by Terry Green after due consideration by the executive board. He also testified that an agency with a small staff could run a campaign successfully if it could sub-contract part of the work; and that CMSD was rejected solely because Debenhams was not sure whether it could deliver. Ultimately the work went to WCRS, which received a fixed fee of about £500,000, and he said that there would have been a similar arrangement with CMSD.

11/4/24, 2:25 PM
Case 4:24-cv-04455-YGR Document 44-1 Filed 11/04/24 Page 39 of 55
MS Dolphin Communications Ltd v Simonet anr [2001] EWHC 415 (Ch) (23rd May 2001)

## C. Millennium/Blue and the clients

69. Until the end of April Mr Simonet and Mr Patterson traded as "Millennium", and, as I have said, from early May the business was conducted by the new company, Blue, which was incorporated on April 30. Mr Simonet and Mr Patterson did not make use of the company organised by Mr Simonet in January, Dolphin (GB) Ltd., probably because they knew (or were advised) that the goodwill in the Dolphin name still belonged to CMSD. The business was carried on at 1 Northumberland Avenue until a move to the Golden Square premises in July 1999 (earlier than the date envisaged in the heads of terms).

70. An article in Campaign magazine for July 9, 1999 (no doubt based in part on a press release from Blue) said that "Paul Simonet, the co-founder of Dolphin, is to be Patterson's partner in the venture, which has also taken on some former Dolphin staff and clients…Blue opens its doors, according to Patterson, with a number of clients in place. These include the former Dolphin clients, Argos, Reebok – an account it shares with Lowe-Howerd Spink – and CIC International, which it shares with Delaney Fletcher Bozell." A brochure was produced by Blue in July 1999 under the title "Blue Total Advertising" and among the clients listed were Argos Direct (quoting a slogan -"It's amazing what you can get down the phone"- coined by Ms Smetham at CMSD), CIC Video (referring to campaign slogans for the films *Antz* and *Sliding Doors* created at CMSD), and Reebok UK Ltd. (quoting a slogan which Mr Simonet accepted was probably coined at CMSD).

71. In the months following the establishment of Millennium/Blue the only clients were Argos, Reebok and DFB. Thus the management accounts of Blue to the end of June 1999 show income of about £140,000 from these clients for the first two months. The written evidence of the defendants in relation to the continuity of the work done by Millennium/Blue on Argos, Reebok and DFB was almost non-existent until immediately prior to the trial. Mr Simonet's statement was very sketchy, none of the employees dealt in their witness statements with the work done by Millennium/Blue, and only Mr Price of Reebok dealt with this question: he said that the projects undertaken for Reebok by CMSD were small and had largely been completed. Almost all of the documents generated at Millennium were destroyed by Mr Simonet for reasons which were not satisfactorily explained.

72. It was only in answer to Mr Bennett's skeleton argument for the trial, which was based on documents recently obtained from the liquidator of Blue, that Mr Simonet sought to say that there was no relevant continuity. The employees were cross-examined about the documents, which largely speak for themselves, and my conclusion is that out of loyalty to Mr Simonet they tended to minimise the connection between the work done by CMSD and that done by Millennium/Blue. But they all accepted that Millennium/Blue had stepped into the shoes of CMSD and that there was a smooth transfer. The representatives of the clients were also cross-examined on the continuity issue, and each of them confirmed, with varying degrees of emphasis, the connection between the work carried out by CMSD and that carried out by Millennium/Blue. Inevitably the detail of the work changed, because the creative work developed as ideas were used or changed.

### Argos

73. On April 19, Mr Simonet telephoned Mr Swanson (and also Mr Licetis, another Argos executive) to say that he had resigned from CMSD, but that there need be no detrimental effect on Argos since he was setting up a new agency and expected to be joined by most of the CMSD staff, and that his new agency would be prepared to work with Argos. Mr Swanson took the view in the course of the week beginning April 19 that Argos would be better off moving its work to the new agency, because it had the staff and expertise to deal with it, and he was confirmed in this view after a meeting with Mr Ball who, Mr Swanson thought, seemed more concerned with obtaining payment for work done than with handling the business. When Mr Ball tried to persuade him to leave the Argos work with CMSD, Mr Swanson had said "How could you do it? The staff have gone." An invoice in June 1999 indicates (despite Mr Simonet's denial) that Mr Simonet had given an estimate for work as early as April 20. Blue continued to work for Argos until December 1999.

74. The work done by Millennium/Blue for Argos was a clear continuation of the work being undertaken by CMSD, and Mr Swanson confirmed in the witness box that CMSD would have continued to do the work throughout 1999 if Mr Simonet had stayed. I accept the submission for CMSD that the work done by

Millennium/Blue involved essentially the same ideas, similar slogans and scripts ("it's amazing what you can get down the phone" "You dial we deliver"), the use of the same art work (e.g. the teddy bear being sold down the telephone line), the use of the same production company, the same animators, the same model makers, the same voice over actors and a very similar advertising campaign. Mr Simonet had no answer, except for the suggestion that the Easter phase of the work had been completed by April 16, and that further work required an evaluation of the response to the campaign to date. I have no hesitation in rejecting Mr Simonet's evidence that there was a distinction between the work done to April 16 and that done thereafter. The campaign was a year long one, and CMSD's retainer was for 12 months.

75. In his evidence Mr Simonet said that the Argos retainer would not have been payable if what he described as the second phase of the campaign not gone forward. But on May 12, Blue invoiced Argos for the retainer for the last ten days of April, and for May and June, and Mr Swanson accepted that the right to the retainer fee was not contingent. Argos paid to Blue the retainer fee for the last ten days of April and the rest of the year, in the aggregate sum of £67,000. Blue also invoiced Argos for production costs of at least £140,000, on which it earned a profit and contribution to overheads.

**Reebok**

76. Mr Simonet telephoned Mr Price of Reebok over the weekend of April 17/18 and told Mr Price that he had resigned from CMSD because his attempts to develop the company had been frustrated, that he planned to start another agency with BP, and that he would be delighted if Reebok wanted to use its services. Mr Price did not know Mr Ball, and the identity of the entity for which Mr Simonet worked was of no concern to him, provided that he did not inject Reebok into a messy situation.

77. Millennium/Blue continued the research work on Classics footwear, and undertook visuals for trade launches which had been discussed with Reebok prior to April 16. Ms Mooney accepted that there was a direct connection between the work done by CMSD on press advertisements and on the development of Image 2000 and the work done by Millennium/Blue. Mr Price instructed Millennium/Blue to work on a point of sale project for Reebok DMX. CMSD had been involved with this product. It had designed a mock up for a shoe box for direct mail, and Millennium/Blue invoiced for the manufacture of a mock up DMX box for in-store display. Even if the work done after April 19 was not in all respects the same as that done before Mr Simonet left CMSD, the documents show the clearest possible continuity between the work done for CMSD or the projects discussed with CMSD and the work undertaken by Millennium/Blue, using the same photographic and recording studios, doing substantially the same kind of work. I do not accept Mr Scotchbrook's evidence distancing the work done after April 16 from that done before. In the January 1999 business plan Mr Simonet had anticipated a minimum revenue of £50,000 from Reebok over the next 6 months, and Blue invoiced Reebok about £100,000 in 1999, and a further £110,000 in 2000.

**DFB**

78. Mr Cowan of DFB was a personal friend of Mr Simonet, and he had been kept informed of the fact that Mr Simonet might split from Mr Ball. He came to the farewell drinks for Mr Simonet on April 16 at about 6.30 p.m., and his evidence was that Mr Simonet told him that he had resigned, but that business was not discussed. I have no doubt that, even if there was no discussion about the future between Mr Simonet and Mr Cowan, it was implicit in their relationship that Mr Simonet would continue to be instructed to work on the CIC Video project, since CIC had required DFB to have him as part of the team, and Mr Cowan had never even met Mr Ball.

79. Mr Cowan's evidence was that DFB decided at some time in the two weeks following Mr Simonet's departure to work with his new venture, because in reality DFB was interested in working with Mr Simonet in accordance with the client's wishes. On May 25 DFB confirmed that the terms would be the same as those that were in place with CMSD. Mr Cowan's evidence was that Mr Simonet and the staff undertook to ensure that continuity was maintained for DFB and CIC. DFB employed Blue to work with it for CIC until the autumn of 1999.

80. Among the videos in relation to which CMSD participated in discussions with DFB and CIC were *Antz*, *Saving Private Ryan*, *Prince of Egypt*, *Sliding Doors*, *Deep Impact* and *Rugrats*. In particular substantial work was done on *Rugrats*. Millennium/Blue continued essentially the same work on *Rugrats*, and the accounting documents of Blue show that by February 2000 Blue had received about £102,500 from DFB for work done by it, including projects relating to *Rugrats*, *Saving Private Ryan*, and *Prince of Egypt*. Mr Cole worked on the *Rugrats* publicity. Mr Cole went (on behalf of CMSD) to a meeting with DFB on April 19, and he worked on the *Rugrats* publicity for Millennium later that week, although most of the work was done by Ms Smetham. Mr Simonet's evidence was that the *Rugrats* work done by Millennium/Blue was different from that done by CMSD. I consider that this is not only untrue (as the drawings show) but irrelevant, since it was plainly part of one project. He also says that the projects on *Saving Private Ryan* and *Prince of Egypt* had not been briefed while he was at CMSD, and no work had been done by CMSD, and that no work was approved for *Deep Impact* and none was planned. But is absolutely plain from the documents that Mr Simonet had himself participated in planning meetings about the promotion of these videos while he was at CMSD, and that the work done by Millennium/Blue followed on from those discussions.

## XI Legal principles

## A. Directors' duties

81. The principal questions of law which divide the parties are (a) the extent to which a director is accountable for profits which he obtains from contracts entered into after he has resigned, and in particular whether it is a necessary pre-condition of accountability that in obtaining those contracts he has misused trade secrets; and (b) whether the director is accountable for profits made by a corporate vehicle owned by the director through which such profits are made.

82. The essence of the allegation of breach of fiduciary duty is that Mr Simonet (a) was prompted or influenced in his desire to resign as a director of CMSD by a wish to acquire for Millennium/Blue the business or the business opportunities which he had either obtained or was actively pursuing with Argos, Reebok and DFB; and (b) had in fact diverted that business and those opportunities to Millennium/Blue. According to CMSD, a fiduciary must account for a profit or benefit if that profit or benefit was obtained either where there was a conflict or possible conflict between his fiduciary duty and his personal interest, or where that profit or benefit was obtained by reason of his fiduciary position or by reason of his taking advantage of an opportunity or knowledge derived from that fiduciary position. A fiduciary cannot escape the obligation to account by resigning his position.

83. The defence denies breach of fiduciary duty, and denies that the work undertaken by Millennium/Blue was obtained as a result of his negotiations for CMSD at the beginning of 1999, or that the work was undertaken as if it were being performed for CMSD. His resignation was not prompted by a desire to obtain business opportunities belonging to CMSD, but because he had not been paid for two out of the preceding three months, he had been marginalised from financial control, his proposals to providing further funding and a business plan had been rejected and his relationship with Mr Ball was unworkable. He had been informed by Mr Ball that his position was untenable and he had been invited to resign. In any event, a director is entitled to resign, and resignation is not of itself capable of being a breach of fiduciary duty, even if the best interests of the company may be served by his remaining as a director. If he resigns he does not hold the sum of his knowledge on trust for his former company. He is free to exploit such opportunities of which he is aware for his own benefit or for the benefit of others, in the absence of an effective restrictive covenant. The mere use after the termination of a fiduciary relationship of information acquired during the course of it is not a breach of fiduciary duty, unless the use flowed from prior breaches of his fiduciary duties.

## Breach of fiduciary duty

84. For present purposes, the starting point can be taken as *Regal (Hastings) Ltd*. *v. Gulliver* [1942] 1 All ER 378, [1967] 2 AC 134n., although the underlying principles that a fiduciary must not place himself in a position where his duty and his interest may conflict, and that a fiduciary may not retain a profit which he makes from the use of property subject to the fiduciary relationship or which he makes by reason of his

fiduciary position, go back to the eighteenth century: *Keech v. Sandford* (1726) Sel Cas. t. King 61. It is only necessary to emphasise for present purposes that Regal (Hastings) Ltd. was negotiating to buy two cinemas, the Elite at Hastings and the De Luxe at St Leonards. It formed a subsidiary (Amalgamated) to acquire them. Regal could not put up more than £2000, and so three-fifths of the capital in Amalgamated was taken up by the directors (other than the Chairman, Mr Gulliver), by the company's solicitor, and by a number of investors introduced by Mr Gulliver. The shares in Regal and Amalgamated were sold and the new owners of Regal sued the directors (including Mr Gulliver) and the solicitor for an account of the profits on the sale of the shares in Amalgamated. The directors were held to have acted bona fide, because the company could not afford to put up more than £2000 and the only way in which a benefit could have been secured for the company was by the directors finding additional capital themselves.

85. It was held that the directors who took shares in Amalgamated were liable, because as directors in a fiduciary position they used and acted upon their knowledge of an opportunity which they had acquired: "what the directors did was so related to the affairs of the company that it can properly be said to have been done in the course of their management and in utilisation of their opportunities and special knowledge as directors" (Lord Macmillan, at 153): or, as is implicit in the speech of Lord Wright at 154, a person in a fiduciary position must account for profits acquired by him by reason of his fiduciary position, and by reason of the opportunity and/or knowledge arising from it; or a person occupying a position of trust must not make a profit which he can only acquire by use of his fiduciary position (Lord Porter, at 158).

86. The solicitor was not liable because the board of the company had consented to his acquisition of the shares. Mr Gulliver, the chairman, was not liable because he merely introduced investors and made no profit, and (like the other directors) he was acting in good faith: at 140, 151 (especially). Mr Gulliver had a non-controlling interest in two of the companies which he had introduced as investors, but it was held that they did not hold the Amalgamated shares as nominees for him, and there was no evidence that he had made indirect profits through his shareholdings in the two companies.

87. The principle is undoubted, although the actual decision, which gave a windfall to the new owners of the company, has been criticised as applying it over-zealously (*Canadian Aero Service Ltd. v. O'Malley* (1973) 40 D.L.R. (3d) 371, 383, citing Gower, *Principles of Modern Company Law*: see now 6th ed. Davies, p.617). A director in a company with Table A articles may resign at any time from that office without formality. The power is not a fiduciary power, and the right to resign can be exercised however damaging it may be to the interests of the company. The present case concerns the question of how far the principle in *Regal (Hastings) Ltd. v. Gulliver* extends to a director who resigns his office to take advantage of a business opportunity of which he has knowledge as a result of his having been a director. In *Regal (Hastings)* all of the directors concerned were in office at the time of the acquisition of the shares and it is therefore natural that some of the expressions of principle in that case should be related to acts done in the execution of that office: see especially Lord Russell of Killowen ("in the course of that fiduciary relationship…in the course of execution of that office": 143, 147), Lord Macmillan ("in the course of their management": 153).

88. In *Industrial Development Consultants Ltd. v. Cooley* [1972] 1 W.L.R. 443 Mr Cooley was an architect who was also the managing director of the plaintiff company, which was in a group supplying construction services. One of his duties was to procure new business, particularly in connection with the gas industry and the gas boards, since he had highly relevant experience having been chief architect of the West Midlands Gas Board. The company had unsuccessful negotiations with the Eastern Gas Board for a contract to design and build depots. Subsequently the deputy chairman of the Eastern Gas Board made a tentative approach to Mr Cooley in his private capacity about the design and construction of new depots. He realised that if he could obtain his release from his position with the company he could acquire a valuable contract from the board. He falsely told the company that he was ill and obtained a release, and was subsequently awarded a contract by the board which was substantially the same business as the company had been attempting to obtain. Roskill J. held him accountable. The following matters were relevant: (a) Mr Cooley got the work as the result of work which he did while he was still managing director, even though the contract was not concluded until after he had left the company; (b) the company would have wanted the work, which was in substance the same work as they had tried to get (although it had a very small chance – put at 10% by Roskill J. – of

obtaining the contract); (c) he possessed knowledge while a director (that the gas board was back in the market) which was not possessed by the company and which they would have wished to possess. The overriding principle was that a person in a fiduciary position is not allowed to enter into engagements in which a personal interest may conflict with the interests of those he is bound to protect (citing, *inter alia*, *Boardman v. Phipps* [1967] 2 AC 46, 123ff).

89. Roskill J concluded (at 451-3):

> "From the time he embarked upon his course of dealing with the Eastern Gas Board…he embarked upon a deliberate policy and course of conduct which put his personal interest as a potential contracting party with the Eastern Gas Board in direct conflict with his pre-existing and continuing duty as managing director of the plaintiffs. That is something which for over 200 years the courts have forbidden.

> ... [W]hen the defendant embarked on this course of conduct of getting information on June 13, using that information and preparing those documents over the weekend of June 14/15 and sending them off on June 17, he was guilty of putting himself into the position in which his duty to his employers, the plaintiffs, and his own private interests conflicted and conflicted grievously. There being the fiduciary relationship I have described, it seems to me plain that it was his duty once he got this information to pass it to his employers and not to guard it for his own personal purposes and profit. He put himself into the position when his duty and his interests conflicted."

90. The decision lays considerable emphasis on Mr Cooley's breaches of fiduciary duty prior to his release from the company, in particular his failure to inform the company of the information that the Eastern Gas Board was back in the market. But what he did was to divert to himself the very type of contract it was his job to secure for the company (even though it was very unlikely that the company would have won the contract). That might have been a more principled basis for the decision, and is perhaps suggested by Roskill J.'s concurrence in the submission that what Mr Cooley did "was to substitute himself as an individual for the company of which he was the managing director and to which he owed a fiduciary duty" (at 454).

91. In *Canadian Aero Service Ltd. v. O'Malley* (1973) 40 D.L.R. (4th) 371 the facts were similar. The plaintiff, Canaero, which was in the business of topographical mapping, had become a subsidiary of the US company, Litton Industries Inc., which was in the aircraft industry. Canaero had been seeking for some years a contract with the Government of Canada for the mapping, and aerial photography, of Guyana under the Canadian external aid programme. O'Malley was president and chief executive officer, and Zarzycki was a director and executive vice-president. Each resigned in August 1966. Shortly before they resigned they procured the incorporation of a company which after their resignation obtained the contract with the Canadian government. While with Canaero they had been intimately involved in the preparatory work to obtain the contract, including the preparation of a proposal. There was some doubt whether they had been properly appointed as directors of Canaero, but the question was not decisive since it was held that persons in "top management" (as they were) were subject to the same fiduciary duties. They were held accountable on the basis that the requirement to avoid a conflict of duty and self-interest meant that a director or senior officer was precluded from obtaining for himself, either secretly or without the informed approval of the company, any property or business advantage either belonging to the company or for which it has been negotiating, especially where the director or officer is a participant in the negotiations. It did not matter that the director had resigned before he obtained the benefit of the contract, nor that the proposals put by their company to the Canadian government were different from the proposals originally put by their former employer, nor that (by reason of its U.S. ownership) the company was unlikely to be awarded the contract. Laskin J. said:

> "…a director…is precluded from obtaining for himself, either secretly or without the approval of the company…any property or business advantage either belonging to the company or for which it has been negotiating; and especially is this so where the director…is a participant in the negotiations on behalf of the company.

An examination of the case law in this Court and in the Courts of other like jurisdictions on the fiduciary duties of directors and senior officers shows the pervasiveness of a strict ethic in this area of the law. In my opinion, this ethic disqualifies a director or senior officer from usurping for himself or diverting to another person or company with whom or with which he is associated a maturing business opportunity which his company is actively pursing; he is also precluded from so acting even after his resignation where the resignation may fairly be said to have been prompted or influenced by a wish to acquire for himself the opportunity sought by the company, or where it was his position with the company rather than a fresh initiative that led him to the opportunity which he later acquired. ...

In holding that on the facts found by the trial Judge, there was a breach of fiduciary duty by O'Malley and Zarzycki which survived their resignations I am not to be taken as laying down any rule of liability to be read as if it were a statute. The general standards of loyalty, good faith and avoidance of a conflict of duty and self-interest to which the conduct of a director or senior officer must conform, must be tested in each case by many factors which it would be reckless to attempt to enumerate exhaustively. Among them are the factor of position or office held, the nature of the corporate opportunity, its ripeness, its specificness and the director's or managerial officer's relation to it, the amount of knowledge possessed, the circumstances in which it was obtained and whether it was special or, indeed, even private, the factor of time in the continuation of fiduciary duty where the alleged breach occurs after termination of the relationship with the company, and the circumstances under which the relationship was terminated, that is whether by retirement or resignation or discharge." (382, 391)

92. In two decisions in England at first instance in which it was alleged that directors had resigned in order to exploit business opportunities of their companies, the claims failed on the facts because there had been no maturing business opportunity of the company which the director had resigned to acquire. In *Island Export Finance Ltd. v. Umunna* [1986] B.C.L.C. 460 Hutchison J. accepted that the principles in *Canadian Aero Service Ltd. v. O'Malley* also represented English law, but subject to the reservation (see note 1, para. 91, above) in case a literal reading suggested that resignation alone (without being prompted or influenced by a wish to acquire the business) might found liability if his position with the company led the ex-director to the opportunity. He said (at 482):"It would…be surprising to find that directors alone, because of the fiduciary nature of their relationship with the company, were restrained from exploiting after they had ceased to be such any opportunity of which they had acquired knowledge while directors. Directors, no less than employees, acquire a general fund of knowledge and expertise in the course of their work, and it is plainly in the public interest that they should be free to exploit it in a new position." On the facts the director was not liable because the company's hope of obtaining the contract (for the supply of postal caller boxes to the Cameroon) was not a maturing business opportunity, it was not actively pursuing further orders, and the director's resignation was not prompted or influenced by a wish to acquire the business for himself. So also in *Balston Ltd. v. Headline Filters Ltd.* [1990] F.S.R. 385, 411, Falconer J. agreed with the comment made by Hutchison J on the decision of the Supreme Court of Canada. See also *Framlington Group plc v. Anderson* [1995] 1 B.C.L.C. 475, 495-6.

93. The policy behind *Canadian Aero Service v. O'Malley* is set out in a passage which after referring to *Boardman v. Phipps* and *Industrial Development Consultants Ltd. v. Cooley*, goes on:

"What these decisions indicate is an updating of the equitable principle whose roots lie in the general standards…loyalty, good faith and avoidance of a conflict of duty and self-interest. Strict application against directors…is simply recognition of the degree of control which their positions give them in corporate operations…It is a necessary supplement, in the public interest, of statutory regulation and accountability…" (40 D.L.R. (3d) at 384)

94. As I have said, the decision in *Industrial Development Consultants Ltd. v. Cooley* was based on the failure to disclose material matters to the company and misuse of confidential information. The Supreme Court of Canada expressly rejected breach of confidence as a legal rationale for its holding (at 388): "The fact that breach of confidence…may itself afford a ground of relief does not make [it] a necessary ingredient of a successful claim for breach of fiduciary duty." So also it was not a pre-condition of liability that the directors had acquired special knowledge while acting as such (at 390). The directors "continued, after their

resignations, to be under a fiduciary duty to respect Canaero's priority, as against them and their instrument…, in seeking to capture the contract" (at 390-391).

95. In English law a director's power to resign from office is not a fiduciary power. A director is entitled to resign even if his resignation might have a disastrous effect on the business or reputation of the company. So also in English law, at least in general, a fiduciary obligation does not continue after the determination of the relationship which gives rise to it: *Att. Gen. v. Blake* [1998] Ch 439, at 453, varied on other grounds [2000] 3 WLR 625 (H.L.). For the reasons given in *Island Export Finance Ltd. v. Umunna* a director may resign (subject, of course, to compliance with his contract of employment) and he is not thereafter precluded from using his general fund of skill and knowledge, or his personal connections, to compete.

96. In my judgment the underlying basis of the liability of a director who exploits after his resignation a maturing business opportunity of the company is that the opportunity is to be treated as if it were property of the company in relation to which the director had fiduciary duties. By seeking to exploit the opportunity after resignation he is appropriating for himself that property. He is just as accountable as a trustee who retires without properly accounting for trust property. In the case of the director he becomes a constructive trustee of the fruits of his abuse of the company's property, which he has acquired in circumstances where he knowingly had a conflict of interest, and exploited it by resigning from the company.

**Duty to account**

97. In many cases, an account of profits will be a more advantageous remedy than equitable compensation, since the actual profits obtained by the director may be higher than the damages for the loss of opportunity suffered by the company, particularly where (as in *Industrial Development Consultants Ltd.. v. Cooley* and *Canadian Aero Service Ltd. v. O'Malley*) the company had little or no prospect of obtaining the benefit of the opportunity. The fiduciary is liable for the whole of the profit. There are no firm rules for determining which is the relevant profit: see *Hospital Products Ltd. v. United States Surgical Corp.* (1984) 156 CLR 41, at 110, *per* Mason J. Where, as here, the business (to use a neutral term, not distinguishing between Mr Simonet and Blue) is not restricted exclusively to the performance of contracts which were obtained from CMSD, the fiduciary should be accountable for the profits properly attributable to the breach of fiduciary duty, taking into account the expenses connected with those profits and a reasonable allowance for overheads (but not necessarily salary for the wrongdoer), together with a sum to take account of other benefits derived from those contracts. For example, other contracts might not have been won, or profits made on them, without (e.g.) the opportunity or cash flow benefit which flowed from contracts unlawfully obtained. There must, however, be some reasonable connection between the breach of duty and the profits for which the fiduciary is accountable.

**Effect of use of corporate vehicle**

98. In this case, as I have said, Blue is hopelessly insolvent, although it is said to have made profits from the contracts in question. Mr Simonet has personally made no profits, and claims that there is therefore nothing for which he should account. According to CMSD, he remains accountable for the profits. Does it make a difference to the remedy for an account of profits whether the director exploits the opportunity personally, or through a partnership, or through a company controlled by him? In particular, is there a remedy against the director where the profits are made by a company against which there is no effective remedy, because for reasons unconnected with the relevant contracts it is hopelessly insolvent? The question is one of practical importance because the case of an individual trading as such (as distinct from through a corporate vehicle) is rare in purely commercial transactions. In this case the trading was done through the Millennium partnership for about two weeks, and then through Blue.

99. Where the director puts the contract into a partnership, he is fully accountable even if his partners are entitled to part of the profit and are ignorant of his breach of fiduciary duty. In *Imperial Mercantile Credit Assn. v. Coleman* (1873) L.R. 6 H.L. 189 Mr Coleman, a director, was accountable for a profit on a contract with the company in which he had not disclosed an interest. The profit was made on a contract with a firm of stockbrokers, Messrs Knight and Coleman, for the placing of debentures on commission. It was argued that

even if Mr Coleman was liable to the company, it was only his share of the profits which he was bound to restore, and not those attributable to Mr Knight's share. That argument was rejected by the House of Lords. Lord Chelmsford said (at 202):

> "…the liability of partners who are implicated in a breach of trust (and this is an analogous case) has been held to be joint and several. It would be a strange conclusion that Mr Coleman, who was the active agent in diverting the money, which belonged to the association, to the partnership funds, should not be answerable for the whole, whether his co-partner, Mr Knight, was liable or not for any part of it."

Lord Cairns said (at 208):

> "The profit on the transaction was obtained by Mr Coleman, and…was obtained by him as a director of the association. Whether he desired or whether he determined to reserve it all to himself or to share it with his firm appears to be perfectly immaterial. The source from which the profit is derived is Mr Coleman. It is only through him that his firm can claim. He is liable for the whole of the profits which were obtained; and it is not the course for a Court of Equity to enter into the consideration of what afterwards would have become of these profits."

100. Where the business is put into a company which is established by the directors who have wrongfully taken advantage of the corporate opportunity, it was held in *Cook v. Deeks* [1916] 1 AC 554 (P.C.) that both the directors and the company are liable to account for profits. Directors of the Toronto Construction Company formed the Dominion Construction to divert a contract to build a railway line for the Canadian Pacific Railway. They entered into the contract personally and then subsequently "the contract was….taken over by this company, by whom the work was carried out and the profits made" (at 561). The conclusion was (at 563, 565):

> "….the defendants T.R. Hinds and G.S. and G.M. Deeks were guilty of a distinct breach of duty in the course they took to secure the contract, and…they cannot retain the benefit of such contract for themselves, but must be regarded as holding it on behalf of the company….It follows that the defendants must account to the Toronto Company for the profits which they have made out of the transaction…Their Lordships have throughout referred to the claim as one against the defendants G.S. Deeks, G.M. Deeks, and T.R. Hinds. But it was not, and could not be disputed that the Dominion Construction Company acquired the rights of these defendants with full knowledge of the facts, and the account must be directed in form as an account in favour of the Toronto Company against all the other defendants."

101. In *Canadian Aero Service Ltd. v. O'Malley* it was clearly no impediment to the liability of the directors to account for profits that the contract was obtained by a company which they had formed to exploit the opportunity. The British Columbia Court of Appeal came to the same conclusion in a case where the defendant owned 50% of the corporate vehicle through which the profit was obtained: *Baillie v. Charman* (1993) 107 D.L.R. (4th) 577.

102. Neither *Cook v. Deeks* nor *Canadian Aero Service Ltd. v. O'Malley* was treated a case of piercing or lifting the corporate veil. The directors and their company were each liable to account. Some cases have held the director liable to account on the basis that he was to be identified with the company on a piercing or lifting the corporate veil rationale. In *Gencor ACP Ltd. v. Dalby* [2000] 2 BCLC 734, Rimer J. held a director liable for the dishonest diversion of business opportunities which had been channelled into an offshore company which was wholly owned and controlled by him, and which was no more than a shell. It was simply a creature company and was to be identified in equity with the director. So also an Australian court treated a company into which contracts had been channelled as the alter ego of the director: *Green v. Bestobell Industries Pty* [1984] W.A.R. 32, 40.

103. Is the position different where (as here) the corporate vehicle genuinely carries on business, and has real premises and a staff? Even in such a case it is possible that the piercing the corporate veil approach may be

justified if the company was incorporated to perpetrate what must be regarded as wrongdoing close to fraud: *cf. Re H* [1996] 2 BCLC 500. But I do not think that it is necessary to resort to piercing or lifting the corporate veil, since *Cook v. Deeks* shows clearly (as does *Canadian Aero Service Ltd. v. O'Malley*) that the directors are equally liable with the corporate vehicle formed by them to take unlawful advantage of the business opportunities. The reason is that they have jointly participated in the breach of trust.

104. Nor in my judgment does it make a difference whether the business is taken up by the corporate vehicle directly, or is first taken up by the directors and then transferred to a company. *Imperial Mercantile Credit Assn. v. Coleman* and *Cook v. Deeks* show that a director who places the benefit of the business opportunities in a partnership or a company will be liable for the whole profit, and also make it clear that a director who is the active agent in a breach of fiduciary duty cannot evade responsibility by transferring the benefit to others. I do not consider that the liability of the directors in *Cook v. Deeks* would have been in any way different if they had procured their new company to enter into the contract directly, rather than (as they did) enter into it themselves and then transfer the benefit of the contract to a new company. Alternatively (although it is my view rather artificial to so treat it) the company may be liable to account for profits on the basis of knowing receipt of trust property (including profit deriving from a breach of trust: Lewin on Trusts, 17th ed. 2000, para. 42-24), and the director/shareholders who set it up will be liable as principal wrongdoers. Whatever the analysis they will be constructive trustees of the profits and liable to account.

105. Consequently I do not consider that Mr Simonet can derive any assistance from one aspect of *Regal (Hastings) Ltd. v. Gulliver* on which Mr Croxford relied. As I have indicated, in *Regal (Hastings) Ltd. v. Gulliver* the chairman, Mr Gulliver, who had instigated the whole scheme, was held not to be liable. In particular it was held that he had not profited from the scheme notwithstanding that he held minority interests in two companies which had subscribed for shares in Amalgamated. There was no finding at trial that the shares in Amalgamated belonged to him, and there was no evidence that he had made a profit from his shares in the two companies. This is not authority for the proposition that where a director puts the profit into a company in which he has an interest he is not accountable for profits. First, one of the striking features of *Regal (Hastings) Ltd. v. Gulliver* is that the directors were held to have acted in good faith. Second, Mr Gulliver did not establish the companies to take the benefit of the shares in Amalgamated. Third, there was no evidence that the companies in which Mr Gulliver had an interest knew of the matters which made the actions of the directors a breach of fiduciary duty. Fourth, Mr Gulliver had only a minority interest, and there was an express finding he had made no profit from the companies.

## B. Contract of employment

106. CMSD's position is that from about January 28, 1998 Mr Simonet had been employed under a oral contract of employment, of which there were implied terms that he would serve CMSD with fidelity and in good faith and that it was determinable on reasonable notice (which, according to CMSD, was six months). He purportedly resigned on April 16 without giving adequate notice. His failure to work for CMSD after that date and/or to give the company due notice of his intention to terminate his employment was a breach of contract, and he thereafter continued to owe a duty of fidelity, and in breach of that duty he solicited CMSD's customers, set up in competition with CMSD, and persuaded the employees of CMSD to leave their employment and/or to join Millennium. In addition, the persuasion of the employees to leave was pleaded as wrongful inducement of breach of contract.

107. Mr Simonet's position is that the reasonable period of notice under the contract of employment was three months, but that the failure to pay the March salary, and the alteration of the bank mandate (and also, as originally pleaded, the appointment of Mr Webb) on April 16 amounted to a repudiatory breach of contract. Mr Simonet was entitled to summarily determine his contract of employment as a result of the breaches, or because determination was sought by CMSD. CMSD denies that the failure to pay the March salary and the alteration of the bank mandate (nor, as originally alleged, the appointment of Mr Webb) were breaches, but says that even if the refusal by Mr Ball to sign the March salary cheque was a repudiatory breach Mr Simonet failed to elect to treat it as terminating the contract within a reasonable period, and he was not entitled to exercise the power to terminate without giving CMSD a chance to cure the breach.

108. In this case there was no written contract, and no relevant oral terms except with regard to the quantum of salary. The relevant principles on the main issues with regard to the claims for breach of the contract of employment are these. First, there is an implied term that the employee will serve the employer with loyalty and fidelity. Second, acts done while the contract of employment subsists but which are preparatory to competition after it terminates may not in themselves be in breach of the implied term as to loyalty and fidelity: *Laughton & Hawley v. Bapp Industrial Supplies Ltd*. [1986] I.C.R. 634; *Tither Barn Ltd v Hubbard*, EAT, November 7, 1991); contrast *Marshall v. Industrial Systems and Control Ltd*. [1992] I.R.L.R. 295.

109. Third, while the contract of employment subsists the employee may not use confidential information to the detriment of the employer; after it ceases the employee may compete, and may use know-how acquired in the course of his employment (as distinct from trade secrets – although the distinction is sometimes difficult to apply in practice): *Roger Bullivant Ltd*. *v. Ellis* [1987] ICR 464, applying *Faccenda Chicken Ltd*. *v. Fowler* [1986] I.C.R. 297. In *Symbian Ltd*. *v. Christensen*, unreported, May 8, 2000 (affd without reference to this point [2001] IRLR 77, C.A.), Sir Richard Scott V-C. refused an injunction to enforce the obligation of good faith and fidelity in a case where the employee was on garden leave. It was held that the arrangement for garden leave had fundamentally and irretrievably undermined the employment relationship between the parties. The contractual relationship continued but the employment relationship was destroyed, and Sir Richard Scott V-C said that he did "not think that thereafter there can subsist any implied obligation of good faith and fidelity between the parties" (at p. 19). But in that case there was a contractual agreement that the employee was not to carry out his duties. It cannot follow from that decision that an employee can unilaterally put an end to his duties of fidelity simply by leaving without notice in order to take away the employees and compete. In my judgment the obligations remain in being unless the contract is determined.

110. Fourth, the contract of employment (in the absence of an express term) may be determined on reasonable notice. What is reasonable depends on all the circumstances, and may have to reflect the prevailing standards on employment mobility. Fifth, for most purposes (but not for all) neither the employer nor the employee can unilaterally bring the relationship to an end by breach. Sixth, a breach of the terms of the employment contract by the employer (including an attempt to force on the employee a variation against his or her will) may be so serious as to be repudiatory and entitle the employee to treat it as terminating the contract or as a constructive dismissal. Seventh, a failure to pay the agreed remuneration is a breach of contract (unless the employee has waived the right to receive payment or has agreed to a delay in payment), but is not necessarily a fundamental or repudiatory breach. A deliberate, repeated and persistent failure is likely to be repudiatory (*Cantor Fitzgerald International v Callaghan* [1999] ICR 639) but whether a failure to pay amounts to a repudiatory breach is a question of degree to be answered in the light of the facts. Eighth, a party who refuses to perform without giving a reason may later justify it on the ground of the other party's repudiation, but not where the breach could have been put right: *Heisler v. Anglo-Dal Ltd*. [1954] 1 W.L.R. 1273.

## XII Conclusions

111. I am satisfied that from early 1999 Mr Simonet was considering going it alone, and that by March 1999 he had decided that Mr Patterson was a more qualified and more reliable partner than Mr Ball, and that if he could not force Mr Ball out of the business he would set up separately with Mr Patterson in new premises and with a new company, culminating in his final ultimatum to Mr Ball that if Mr Ball did not agree the terms for a "smooth transfer to new P.S. company", then "things would get nasty." Mr Simonet had a twin strategy, which explains many of his actions. His first preference was to persuade Mr Ball to agree to eliminate or reduce his interest in CMSD. The second was, if agreement could not be reached, to set up on his own with the same clients, but also to insulate himself from a charge that he had appropriated the property of CMSD.

112. The first significant act was the establishment of Dolphin (GB) Ltd. early in January 1999. Although it was not ultimately used, and no bank accounts were established for it, I consider that the fact that the bank was shown bank statements for CMSD when being asked to open an account indicates that Mr Simonet had it in mind as a vehicle to take over the Dolphin part (i.e. "his" clients) of the CMSD business. I do not accept Mr Simonet's evidence that he formed it only because he was concerned that Mr Ball would force CMSD into liquidation.

113. Next, not only did Mr Simonet approach Mr Patterson as a possible partner and investor in December 1998, but very soon after Mr Patterson expressed interest in mid January 1999, Mr Patterson set about obtaining premises, and ultimately heads of terms were signed on behalf of "Dolphin Advertising". I am satisfied that the instructions were given to the estate agents, and the heads of terms were entered into on the basis that the premises would be used by a new entity controlled by them if they could not get Mr Ball to agree to a take-over by them of CMSD. If CMSD were taken over by them the premises could be used by CMSD. I reject the evidence of Mr Patterson and Mr Simonet that the Adams Burnett approach was made on behalf of Mr Patterson solely for offices to launch a new company, initially in his own interest, and progressively for Dolphin if there was no constructive resolution on a split. I reject the evidence of Mr Simonet that there was no deliberate decision not to tell Mr Ball about the search for new premises. I also reject as absolutely incredible the evidence of Mr Simonet that he did not know of the existence of the heads of terms. It is also telling that the documents containing the instructions to the agents and the heads of terms were not disclosed by the defendants in these proceedings.

114. The next significant matter is Mr Simonet's opposition to the involvement of Mr Webb. This was, in my judgment, motivated by a number of factors. First, he was concerned that Mr Ball might have an ally who would be a counterweight to Mr Patterson. Second, Mr Webb was likely to discover that, first, there were significant contracts with Argos and DFB, and also that there was substantial unbilled work in progress. Such a discovery would affect both aspects of the twin strategy, since it would make it more difficult to persuade Mr Ball to leave the business, and more difficult to appropriate the business to a new company.

115. Even more telling is Mr Simonet's treatment of the Argos and DFB contracts. Before and during the litigation Mr Simonet was at pains to give the impression to Mr Ball, and to maintain to CMSD's solicitors and ultimately to the court, that CMSD had no contracts with Argos and DFB. In order to do this he failed to show Mr Ball the written retainers from Argos and DFB. Mr Patterson accepts that he probably saw them, and yet in the course of the litigation Mr Simonet and Blue (i.e. Mr Simonet and Mr Patterson) failed to disclose the relevant documents, which were no longer in the possession of CMSD and must have been taken by them to Millennium/Blue. The documents were ultimately obtained in this litigation from Argos and DFB.

116. As I have indicated above, Argos sent a fax proposing essential terms on March 4, 1999, which was subsequently accepted orally with a modification of the fee to £8000 per month. DFB's letter setting out the terms was written on March 1, and envisaged a further formal agreement, but DFB and Mr Simonet proceeded on the basis that the agreement was as in the letter. Mr Simonet has an MBA from the London Business School and he cannot have been in any doubt that CMSD had contracts with Argos and DFB on the terms in the correspondence as varied. Yet on April 12, 1999 he informed the CMSD board that he was in the process of formalising the written contract with Argos, which was not true, and that no contract had been formalised with DFB/CIC, which was wholly misleading; and on April 16, he told the board that CMSD "only has one confirmed contract that guarantees a monthly revenue," by which he meant the CRC contract. In addition, as I have said, he did not disclose the length of the Argos and DFB contracts or the fact they were terminable on 3 months notice.

117. In May and June 1999 Mr Simonet told CMSD's solicitors that "there are no written contracts between CMS Dolphin Ltd and its clients" (May 14); and "I have not 'taken over' (whatever that means) any CMS Dolphin contracts. CMS Dolphin did not enter into any contract either with Argos or Delaney Fletcher Bozell. The only contract in existence, to my knowledge, was with The Cancer Research Campaign" (June 29). Mr Simonet claimed that the letter from DFB of March 1 did not confirm an agreement, and was just a negotiating tactic, but he could not refer to any negotiations, and Mr Cowan said it meant what it said. I am satisfied that Mr Simonet's evidence that DFB's letter was simply part of the negotiations was false. Mr Simonet made what was, in my judgment, rightly described as the preposterous suggestion that the DFB letter was not in his possession because he had been so appalled by its terms that he had discarded it. I also regard as wholly unbelievable his suggestion that DFB's confirmation of the terms with Blue on May 25 (another document which was not disclosed by Mr Simonet, and neither he nor Mr Patterson had any adequate explanation for its non-disclosure) was accepted because there was no time to re-negotiate.

11/4/24, 2:25 PM
Case 4:24-cv-04455-YGR Document 44-1 Filed 11/04/24 Page 50 of 55
RMS Dependant v Stonehouse & anr [2001] EWHC Ch (3rd May 2001)

118. The next matter is the rental of the offices at Northumberland Avenue. The original approach was made on April 12 or 13. Despite the assertion by Mr Simonet and Mr Patterson that this approach was made because of a fear by Mr Simonet that he might be forced out of CMSD by Mr Ball and this be left with no working base, I am satisfied that the approach was in anticipation of Mr Simonet's plan to leave if Mr Ball did not agree to his transferring the clients to a new company. The rental was arranged (for a period beginning April 19) in the middle of April 16.

119. In his witness statement, Mr Patterson had put the time of the visit to Regus in the late afternoon, when they were in fact seeing the staff and later going to the pub. Although it was not put as such to him in the witness box, I think it likely that he said that the visit was made in late afternoon in order to avoid the conclusion that the space was booked in anticipation of Mr Simonet's planned resignation. Secondly, both Mr Simonet and Mr Patterson gave evidence that the space was rented, not to carry on business, but for somewhere for them to discuss the future and plan what business they could do. Mr Simonet, in particular, said that the space was rented so that he could be sure that if he could not reach an amicable departure with Mr Ball he would have somewhere to work with Mr Patterson to plan the future. I am satisfied that they booked the space over lunch because they knew that Mr Ball would not accept the ultimatum, that the resignation was planned to take place that evening, and the space was rented for them to have a base for the business pending a move to other premises and ultimately to Golden Square, which is precisely what in fact happened. Third, Mr Patterson gave wholly unbelievable evidence that he could not remember whether he and Mr Simonet had discussed the possibility of Mr Simonet's resignation beforehand.

120. Both Mr Simonet and Mr Patterson claimed in the witness box that they had no expectation that the clients would follow Mr Simonet to Millennium/Blue. Mr Simonet said that his discussions with Mr Patterson were limited to discussing the cost base of their venture, and that they did not discuss the income which might be derived from the clients. I am satisfied that this was a lie.

121. At all relevant times Mr Patterson was prepared to fund the repayment of Mr Ball's £100,000, albeit in instalments. Terms were agreed for the lease at Golden Square by the end of March. Mr Patterson was prepared to fund the rent on Golden Square, on which a year's rent was due in advance in the amount of £67,620. That was paid on May 1, 1999. He was also prepared to fund salary costs of at least £15,000 per month. Mr Simonet confirmed in evidence that he had discussed funding of about £150,000 to £250,000 with Mr Patterson. The proposals put by Mr Simonet to Mr Ball on April 16 must have been agreed with BP, since Mr Patterson was going to be funding "the smooth transfer" of the clients to the "new P.S. company." Mr Simonet and Mr Patterson must have discussed what would be done about the staff, and I reject the evidence of Mr Simonet that he could not recall any such discussion, and of Mr Patterson that they made a decision to offer employment to the staff only on April 19 or 20. I also reject the evidence of Mr Simonet that it did not occur to him that it might be to his advantage to be able to tell the clients that he had the same staff.

122. It follows that Mr Simonet and Mr Patterson must have discussed the financial prospects of their venture immediately prior to Mr Simonet's departure and their taking of the temporary accommodation in Northumberland Avenue. Mr Simonet's evidence that they had only discussed the cost base makes no commercial sense at all. It is inconceivable that Mr Patterson would not have required information on revenue before committing himself to the project, and that he would not have been expecting the "smooth transfer" of the clients. Mr Simonet accepted that he did some financial planning with Mr Patterson, and he also accepted that there was a business plan, but they were not produced, and Mr Patterson said in the witness box that he would try to find them, and also notes of his conversations with Mr Simonet. But they were not produced. As I have already pointed out, neither Mr Simonet nor Blue produced any documents relating to the period when the business was carried on by Millennium. Mr Simonet said that they had been destroyed (but gave no adequate reason), and Mr Patterson said that there were not many documents in that category because they wanted to trade under the Millennium name as little as possible.

123. It is simply inconceivable that Mr Patterson would have considered such a large investment and that Mr Simonet and Mr Patterson would have made it clear to all the staff that they had jobs waiting for them the following week without having discussed whether the clients would follow Mr Simonet and without an expectation that they would. The reason for Mr Simonet's reluctance to accept the obvious need to consider

revenue as well as expenditure is to avoid the obvious truth that it is most unlikely that Mr Simonet and Mr Patterson were prepared to start a new venture without the benefit of the existing clients. His reference to a "smooth transfer" of Argos, Reebok and DFB showed that he expected them to follow him.

124. I do not accept his evidence that he would have been prepared to start afresh with Mr Patterson without the clients, and that he had no expectation that the clients would follow. Mr Patterson was vague and evasive on the question whether he expected the clients to follow. His evidence was that it crossed his mind that CMSD would be in a difficult position, and that the clients would possibly consider moving with Mr Simonet. But, he said, there might be embarrassment for Reebok and Argos and it was likely they would move on and appoint another agency. When he was asked whether he discussed this with Mr Simonet he said it might have cropped up in conversation but it was not part of a plan. He could not remember detailed conversations about the clients, and he was not relying on the existing clients for income to pay the salaries. I am satisfied that he must have discussed this question with Mr Simonet, and that Mr Simonet led him to believe that the clients would follow. Mr Patterson accepted that CMSD had no value without Mr Simonet and without the three accounts, and he would not have contemplated putting up the money unless the three clients went.

125. The next significant matter is the manner and timing of the resignation. I am satisfied that it was planned to take place on April 16 if (as Mr Patterson certainly expected) Mr Ball did not immediately accept the proposal for the smooth transfer of the clients to a new company. Mr Simonet's statement on April 16 that he was writing in response to Mr Ball's suggestion that he should resign immediately, and that that was "an unpleasant alternative I had not considered until your suggestion Kevin", was self-serving and disingenuous, just as when he said something similar to the staff at the meeting that day.

126. Although I do not consider it an essential part of the case, I accept the submission by Mr Bennett, counsel for CMSD, that the timing of the resignation (like the non-disclosure to Mr Ball of the contractual position with regard to Argos and DFB) was designed to insulate Mr Simonet from the charge that he had appropriated for himself the benefit of contracts belonging to CMSD. I am satisfied that Mr Ball did not reject the proposals on April 16, but asked for more time to consider them, and Mr Simonet was able to give no reason for not giving Mr Ball more time. I see considerable force in the submission that Mr Simonet considered this to be an ideal time, since it was the weekend of the London Marathon, when the main piece of work for Reebok would end, and phase one of the project for Argos had recently come to an end. In addition he had given Mr Ball a deliberately pessimistic account of the financial position of CMSD, and he would have known that once Mr Webb had begun seriously to look at the financial position of the company, its contracts, and its billings, Mr Ball would have insisted on maintaining his interest or would have insisted on his terms.

127. Mr Bennett for CMSD accepts that he is not able to show that the clients were solicited by Mr Simonet for his new venture before he resigned. It was not in fact necessary for Mr Simonet to solicit them beforehand, since he had every expectation that they would follow him. They were his contacts, and he told each of them at once of his resignation. His evidence was that he did this out of "professional and personal courtesy" and in the witness box he suggested, for example, that when he spoke to Argos, he expressed the hope that they could do business together at some time "in the future." I have no doubt that he immediately solicited their business, because (as he said in letters in June 1999 to CMSD's solicitors) he considered that he was absolutely free to compete after his resignation. I am also satisfied that he expected the staff necessary to service the clients to follow him. They had absolutely no reason to stay with Mr Ball, given that they would be paid equivalent salaries and work on the same projects under the same boss.

128. I have already dealt with the continuity of the work for the clients taken over by Millennium/Blue. The most significant features are these: the brochure produced by Blue in July 1999 used slogans in association with the Argos and Reebok names which had been devised at CMSD; the sole income of Blue for the first few months was from Argos, Reebok and DFB; Blue received the retainer which CMSD would have received from Argos; the work done for Argos involved essentially the same ideas, slogans, and scripts as those devised by CMSD; there was a clear continuity also in the Reebok work; DFB retained Blue on the same terms on which CMSD had been retained, and made the same payments to Blue as it would have made

to CMSD. In short, Mr Simonet and Mr Patterson took away from CMSD the benefit of the contracts which it had with Argos and DFB, and the business opportunities it had with all three clients.

129. They were actual contracts or maturing business opportunities in relation to which Mr Simonet had fiduciary duties. If my analysis of the legal principles is correct, it is not necessary for CMSD to show that in so doing, like Mr Cooley in *Industrial Development Consultants Ltd. v. Cooley*, Mr Simonet failed to make proper disclosure about the business opportunities which he had obtained for the company, or that he made improper use of confidential information or trade secrets. If it were necessary, I have already found that Mr Simonet withheld from Mr Ball important information about the business (and in particular the Argos and DFB contracts), and I would also have no hesitation in finding that the information which Mr Simonet had about the terms of the contracts with Argos, Reebok and DFB, and their plans, went far beyond Mr Simonet's fund of know-how, and that he misused the information to divert the contracts and the business to himself.

130. The particular matters which he knew included the dates of commencement and expiration of the agreements; their notice periods; the periodic fees payable, and the services to be provided for those fees; the basis on which CMSD was entitled to charge for other production or project work; the state of the work in progress on the production or project work; the persons who had in their possession artwork, videos, computer files or other materials commissioned by CMSD and to which CMSD was likely to require further access for the purpose of production or project work. That knowledge was properly to be regarded as belonging to CMSD rather than as part of Mr Simonet's general skill and knowledge, and was used to enable Millennium/Blue to step into the shoes of CMSD, so as to perform the agreements as if their terms had been negotiated by and with the new agency and/or to work on the projects as if the new agency had been involved in them from the outset.

131. Mr Simonet put the benefit of the contracts or business opportunities in the partnership Millennium, and then he and Mr Patterson transferred the business without any consideration (other than perhaps the issue of shares) to Blue. Mr Simonet cannot escape the consequences of his own breach of fiduciary duty by transferring the fruits of that breach to a company. He remains the person principally liable. In this case Millennium was a partnership and the facts are directly comparable to the position in *Imperial Mercantile Credit Assn. v. Coleman*, and the transfer of the benefit of the contracts and the business opportunities to a company owned and controlled by Mr Simonet and Mr Patterson is precisely what happened in *Cook v. Deeks* and cannot relieve them of liability. Mr Simonet is responsible for breach of fiduciary duty, and is accountable for profits emanating from the property which he put into the partnership and then transferred to Blue. I would have come to the same conclusion if he had diverted the contracts and business opportunities directly to Blue.

**Termination of the contract of employment**

132. Mr Simonet's salary was £70,000 p.a. He had no written contract, and a draft prepared in 1998 provided for 3 months notice. He did have a written contract of employment with Blue, which provided for a six month notice period. CMSD says that a reasonable notice period was six months. Mr Simonet says that a reasonable period was three months. I do not get much help from the fact that when Mr Simonet and Mr Patterson addressed this question in relation to the contractual period of notice for Mr Simonet's employment with Blue they provided for a six month period, nor from Mr Patterson's acceptance that six months was not uncommon in advertising for senior management, since he was plainly referring to contractually negotiated periods. In my judgment, a reasonable period of notice would have been three months.

133. Mr Simonet gave no notice at all. Mr Ball wrote to Mr Simonet on April 23 to say that he had asked Mr Simonet on April 16 to serve out his notice period, but Mr Simonet had refused to do so. In fact Mr Ball had done no such thing, and he did not maintain in these proceedings that he had.

134. Mr Simonet had given no reasons at the time for his resignation following Mr Ball's failure to accept the terms which he had put forward that morning. But in the course of correspondence and in these proceedings he relied on three matters as justifying the termination of the contract of employment without notice. First, after having on April 22 demanded payment of his salary for January and March, on April 23 he wrote to Mr

Ball to say that his refusal and failure to pay the March salary was a breach of contract and that he accepted the repudiation of the contract, and he repeated this position to Mr Ball's solicitors on April 29, May 14, and June 29, 1999. Second, in a letter of September 7 he claimed for the first time that he had been constructively dismissed by the board resolutions which changed his role in the company and effectively demoted him in a humiliating way, namely the appointment of Mr Webb as a financial director, and the alteration of the bank mandate so that Mr Ball and Mr Stanton could sign cheques without reference to Mr Simonet and thereby control the company without reference to him. Third, in his defence of December 20, 1999 he claimed for the first time that summary determination was sought by CMSD, which was developed in his witness statement to say that he took Mr Ball's letter of April 13 (in which Mr Ball said "You may feel that your position at CMS/Dolphin Ltd is now untenable and we are prepared to accept your resignation from the board immediately") to be "a clear and unequivocal invitation to resign not only from the board, but also as an employee…[which] is clearly what Kevin wanted me to do."

135. Mr Simonet accepts that he agreed that the January salary could be deferred. Mr Ball's position is that each of them agreed in the stand-off over the cheques at the end of March not to require payment of the March salaries in the then current financial state of the company and their continuing discussions about its future. Mr Simonet said he could not recall such an agreement and that there had been only discussions about Mr Ball receiving a salary and no final agreement. There are documents, especially a business plan, in early 1999 envisaging that, on the transfer of his business activities from CMS to CMSD, Mr Ball would be receiving a salary, and he did receive a payment of £5000 in February, although he was not put onto the payroll and no PAYE was deducted. I accept Mr Ball's evidence that it was agreed that he should receive a remuneration, although it seems clear that it had not been formalised in any way. His evidence is supported by the documents to which I have referred and by the payment, and makes commercial sense. His evidence that Mr Simonet agreed not to take his March salary is strikingly confirmed by two documents to which I have referred. In one of his letters of April 1 he had referred to his "lending the company money in order to pay its creditors to ensure the maintenance of the business" and in his memorandum of April 16 on the current financial position of the company he referred to a loan of £17,500 from himself. These were plainly references to his unpaid salary since he had not made any advances to the company. His evidence in the witness box that these references to a loan were "ironic" cannot be accepted. They plainly show that he had agreed to defer his salary.

136. There is nothing in the belated point that the April 16 resolutions amounted to constructive dismissal. First, however much Mr Simonet resented Mr Webb, he agreed to his appointment, and this point was not pursued at trial. Second, adding Mr Stanton as a cheque signatory and not requiring Mr Simonet as a signatory (without excluding him) could not be a repudiation, especially when it was done in response to what was seen as a threat by Mr Simonet not to sign cheques and so paralyse the company. Third, Mr Simonet's evidence was that he had already decided to resign on the previous day.

137. Nor is there anything in the point that Mr Ball's letter of April 13 was taken by Mr Simonet as an invitation to resign as an employee. First, the document spoke only of resignation from the board, and it is plain from Mr Simonet's offer of April 16 that he well understood the distinction between his position as a director and his position as an employee. The whole context of Mr Ball's letter is the untenable position of Mr Simonet as director, and he must have understood it in that sense. He wrote in response to what he described as Mr Ball's suggestion that he should resign immediately, which he said was "an unpleasant alternative I had not considered until your suggestion," which I have already described as self-serving and disingenuous, and the first of his proposals for consideration was "P.S. to resign (as a director and as an employee) with immediate effect." That shows that Mr Simonet was well aware of the distinction. Not only, in my judgment, did he realise that Mr Ball was only talking about resignation from the board to avoid a charge of wrongful trading, but I am also satisfied that Mr Ball could not possibly have been suggesting that he resign from his executive position which would have been disastrous for the company and for Mr Ball, and that Mr Simonet would have realised that.

138. Consequently, Mr Simonet was in breach of his contract of employment by resigning without having given adequate notice. Nothing which Mr Ball did thereafter could be regarded as an acceptance of that repudiatory breach by CMSD. Mere acquiescence in repudiatory breach is not acceptance. Mr Simonet had

no power to terminate his relationship with CMSD unilaterally, and he continued therefore to be subject to his duties under the contract of employment, including his duties of loyalty and fidelity. The invitations to the staff to join him, the solicitation of the customers, and the diversion of the business opportunities were in breach of those duties.

**Inducement of breach of contract**

139. Mr Simonet (and Mr Patterson) made it absolutely clear to the staff on the Friday that he was leaving CMSD and that they would all have jobs with him if they wanted. Although I am very sceptical of the evidence of Mr Patterson that he intended to hire the staff only if they resolved their position with Mr Ball, and also have reservations about the evidence of some members of the staff that they decided to join Mr Simonet and Mr Patterson only after they decided to leave CMSD, I am not satisfied that CMSD has proved on the evidence that Mr Simonet induced the staff to leave without giving any notice. This question is, however, academic, since in my judgment the offer to the employees and their subsequent employment by Mr Simonet as a partner in Millennium was a breach of the duty of fidelity under his contract of employment which continued to subsist.

**XIII Remedies**

140. As regards the allegation of unlawful diversion of the business opportunities of CMSD, CMSD is entitled (at its option) to equitable compensation or an account of profits (in relation to Argos, Reebok and DFB) from Mr Simonet, not only in respect of profits made by him in the short period in which he and Mr Patterson traded as Millennium, but also for the period they traded as Blue. What Mr Simonet diverted was not simply such business as gave rise to profits in the period that Millennium traded. He diverted the benefit of the existing Argos and DFB contracts and the opportunities that were associated with them and with the Reebok connection. CMSD does not seek an account for any period beyond 1999, and there are therefore no difficult issues of connection and causation with regard to Argos and DFB, where the contracts were for the calendar year, and it is a reasonable period for an assessment of the Reebok work flowing from the breach of fiduciary duty. It is implicit in this exercise that Mr Simonet is entitled to credit for the expenses incurred by Millennium/Blue in earning the profits including a reasonable proportion of overhead, and I will hear argument as to whether that should include salary paid to Mr Simonet and Mr Patterson, and as to whether any other points of principle will arise on the taking of an account.

141. The principal additional loss said to flow from any breach of Mr Simonet's breach of his contract of employment (principally his failure to give notice and his recruitment of all of the staff) is CMSD's loss of the chance of winning the major Debenhams contract, and its inability to earn the fees on the "Vision Day.". The following factors are relevant. CMSD lost the benefit of the second instalment of £12,500 for the Vision Day programme, and had to perform other services instead of repaying the first instalment. I consider that CMSD is entitled to £12,500, together with the direct cost of providing those other services, i.e. what was expended which would not otherwise have been expended. The quantification of damages for the loss of the opportunity to obtain the commission for the brand building campaign depends on an assessment of the chance of obtaining the commission, and what profits would have been made from it. For this purpose I assume (as I must in accordance with the normal principles for damages) that Mr Simonet had given three months notice on April 16, 1999, and that he would have left in mid-July 1999. In those circumstances Mr Ball would have had more time to prepare for his departure. There was no evidence of the detailed terms (such as notice periods etc) on which Debenhams would have retained CMSD. In my judgment, if Mr Simonet had not resigned, the Vision Day would have gone ahead successfully, and CMSD would have met the June 14 deadline for pitching for the work, and would have been short-listed. But (as I have said) for the purposes of assessing damages I have to assume that Mr Simonet would have given notice, and that he therefore would have left by the time the contract was awarded. In any event, the agency would have remained a small agency which would have been required not only to bring in new expertise to replace Mr Simonet, like Mr Rick Holmes, but would have also undertaken the work, if it had been awarded, in conjunction with another agency. CMSD claims that the fee would have been about £300,000 (and there was evidence supporting a bracket of between £300,000 and £500,000), on which a profit of 10% to 15% (and not 30% as in the over-optimistic business plans) might have been earned. I consider that in all these

circumstances CMSD would have had a 50% chance of obtaining the contract, and that it probably would have had to share some of its commission. Taking into account all the uncertainties, I consider that an appropriate figure to compensate for the loss of the chance is £20,000.

142. I will hear argument on the question whether there are other heads of damage in relation to which an enquiry or account should be ordered. If there had been no effective remedy in relation to the allegations of breach of fiduciary duty, I would have held that the breach of the duty of fidelity (which would have involved the acquisition of the Argos, Reebok and DFB accounts) would have justified the remedy of an account of profits and not simply damages. In *Att. Gen. v. Blake* [2000] 3 WLR 625, 639 (H.L.) Lord Nicholls said that one of the exceptional circumstances which would justify a restitutionary remedy for breach of contract was the characterisation of a contractual obligation as fiduciary and a finding that the claimant has a legitimate interest in preventing the profit-making activity of the defendant. This is such a case.

## XIV Counterclaim

143. Mr Simonet was not paid salary for January and March 1999, and for the first half of April. In answer to his claim for the arrears of salary, it was said that he has suffered no loss because he was paid those sums by Blue. But those amounts are due as a debt (*Abrahams v. Performing Right Society* [1995] ICR 1028; *Thames Water Utilities v. Reynolds* [1996] IRLR 186) and the claim is not affected by any payment by Blue. Belatedly, after the trial, it was suggested that Blue had made the payments with the purpose of discharging the debt, but what little evidence there was on this aspect did not support that contention. He is therefore entitled to credit for unpaid salary to April 16, 1999.

144. Mr Simonet's claim to be reimbursed £2,500 paid to Mr Jonathan Davies fails because he has not produced any documentary evidence of the payment, nor any plausible reason why the payment was made, and there is no legal basis for CMSD's liability to Mr Simonet: Goff and Jones, Law of Restitution, 5th ed. 1998, p. 438**.** Mr Simonet claims reimbursement of £1,760 paid to third parties on behalf of CMSD, and it is accepted that he is entitled to these sums if he can show they were paid by him. I am satisfied that he did pay them, and is therefore entitled to credit for that amount.

******* ****** ******

© 2001 Crown Copyright

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWHC/Ch/2001/415.html*